[Crim. No. 2622. Third Dist. Nov. 9, 1955.]

THE PEOPLE, Respondent, v. FRANK KEELIN, Appellant.

James R. Hardin and Edmund Gorgas for Appellant.

Edmund G. Brown, Attorney General, and Gail A. Strader, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—Appellant was indicted by the grand jury of Tuolumne County under a charge of murdering one Raymond T. Etherton. He was tried and the jury found him guilty of murder of the second degree. He appeals from the judgment which followed and from the order denying him a new trial.

We may say generally that it was the theory of appellant that on the occasion of the killing Etherton had burglariously entered appellant's domicile and was in the act of stealing money; that whatever wounds appellant inflicted upon Etherton were inflicted at that time and place and that, under the circumstances, the homicide was justifiable. It was the theory of the prosecution that, although some shots had been fired in appellant's domicile, nevertheless no serious wounds had been then inflicted and that Etherton had left the domicile and been gone therefrom for some time when appellant followed him and fired the fatal shots without excuse or justification. There is in the record substantial evidence in accordance with the theory of the prosecution, which supports the judgment. There is also substantial evidence in the record which supports the theory and the defense of appellant. The errors complained of have to do with the admission of evidence and with instructions given, and these errors are claimed to have been magnified in legal effect by the denial to appellant of his constitutional rights. We agree with appellant that the judgment and order appealed from must be reversed.

In order to present the assignments of error we think it

necessary to state the pertinent evidence substantially in the order in which it was introduced in the trial court. By stipulation a map was received which shows the following physical facts concerning the scene of the crime: As one leaves the city of Sonora on Highway 108 and travels north he passes the intersection of a road leading to the east. At a distance of 980 feet from the highway on that intersecting road is a place called "Indian Camp." At that point defendant, hereinafter called "appellant," lived in a trailer house owned by him. Etherton lived in a lean-to contiguous to appellant's trailer. Along the westerly side of the highway there is an abrupt upslope or bank with a height varying from 4 to 10 feet.

A Doctor Boice was called. He had performed an autopsy upon the body of Etherton. He testified that he observed on the body the following bullet wounds: One bullet had entered at the left side below the rib cage, traversed upward and to the spine and had shattered into small bits when it contacted the spinal column. It had passed through several loops of intestines on the way. Another bullet had entered below the rib cage, had gone through the liver, severing the main branch of the hepatic artery and had lodged back of the liver. Two other bullets had inflicted only flesh wounds. There was also a large stellate lesion on the forehead of the decedent, presenting a jagged, torn area. Its appearance indicated that it had been made by some type of blunt instrument or, as the witness stated, "it looked like a rock . . . like something a rock had produced." The witness said that, considering that the body of decedent was found on the highway 980 feet from the trailer, he could have walked or run from the trailer house to the highway, although he would have been in great pain; that such a journey would be improbable but not impossible; that he would have been bleeding profusely; that the witness had found 2 quarts of free blood in the abdominal cavity; that when an artery of that size is bleeding it is improbable that a man would go very far; that if he ran or walked the exertion would increase the flow of blood from the wound. The witness said further that either of the two abdominal wounds could have caused death; that from the wound which perforated the bowel death would be expected within 24 hours, but that, considering the wound that severed the hepatic artery, it would be inconsistent with probability "that he would have lived at all." Said the doctor: "With either

[wound] it was unlikely for him to live over 10 to 15 minutes, half an hour at the longest, even if he were lying down.'' The foregoing testimony was given on direct. On cross-examination the witness testified as follows: With respect to the wound which severed the hepatic artery he would doubt that Etherton could have walked more than a few steps, and that from the loss of blood he would not have expected him to live very long and would say he would go into such profuse shock that he wouldn't be able to walk; that he would pass right out; that he doubted if with that wound he could walk the length of the courtroom in which the trial was held; that he would go into shock; that notwithstanding all that, it might be possible to walk a greater distance as sometimes under the circumstances humans will do very remarkable things; that the witness doubted it would be possible for Etherton to walk 980 feet with the amount of blood he had lost since blood pours out rapidly from a blood vessel like the hepatic artery and the victim would go into shock in two or three minutes at the very minimum—profound shock. The witness' attention was called to his testimony at the coroner's inquest preceding the trial in which he stated that in his opinion it would be possible for Etherton to have walked appreciable distances, although awfully hard. Said the witness: ''It would be awfully hard for him to walk with this one [the wound that severed the artery], but I suppose he did.'' The witness said that with the wound that severed the bowels, it would have been difficult for him to have walked any appreciable distance, but he could have done it; that it wasn't absolutely impossible. Said the witness after reading his previous testimony: ''I couldn't say it is absolutely impossible. Like I said there, I think it's highly unlikely a man could walk that far.'' Concerning the stellate wound upon Etherton's forehead, the witness said he thought it could not have been caused by falling and hitting his head on the ground, although if he pitched down a bank it could have happened; that in his opinion a blunt instrument had been used to inflict that wound.

The Sonora chief of police testified. He said they had arrested the appellant at his trailer house and that a search of the trailer house disclosed a wallet containing something over $60, and a second wallet with $1.00 in it; that, although they had found a bullet hole in the wall of the trailer and several spent cartridge cases and a rifle, they found no blood-stains; that going down the road toward the highway, which

road was wet and muddy, they had found no bloodstains until near, and upon, the highway.

Two men, a Mr. Johnson, and a Mr. Bezemer, at 5 o'clock on the morning of the homicide had left Sonora and just before reaching the intersection of the state highway with the side road had observed in the darkness what appeared to be the figure of a human being lying on the side of the road. Another figure appeared to be bending over it. They passed the spot and then determined to return and investigate. They then saw the figure of Etherton on the highway and observed, upon the bank, another person, who quickly disappeared. Johnson was the first of the two to testify. He said that he observed the two figures on the highway, one bending over the other and when he had turned his car about and come back to the scene the one that had been standing was on the bank. He could not say whether that person was large or small or whether it was a man or a woman, although it looked to be a man. The figure wore a long brown coat, but he couldn't tell whether it was a raincoat or an overcoat, it was so dark. He had not noticed whether the figure wore a hat or not and he had not had a look at the features. He said he could not recall anything except that it was someone dressed in a long coat who was on the bank. He said he had asked Etherton as he lay on the road if he had been run over and Etherton replied ''No'' and said he had been shot. The witness then told Bezemer to stay there while he went to get the police. He drove to Sonora and after the police arrived he left the scene. He had observed a rock about a foot from Etherton's body and saw no other rocks in the immediate area. On cross-examination he said as to the person he had seen standing over Etherton that he could not tell whether he was tall or short, heavy or slight. Bezemer next took the stand and testified much as had Johnson. He had seen the figure which had been bending over Etherton, going up the bank. He said the figure wore a long overcoat; that he couldn't swear it was a man; he couldn't recollect the color of the overcoat, nor identify the coat as the coat of appellant which was shown to him. He spoke to Etherton and asked him what had happened. At this point counsel for appellant objected that no proper foundation had been laid to introduce any statement of Etherton. Said the court: ''Are you going to introduce a dying declaration?'' Prosecuting attorney: ''Not at this time, Your Honor. [Counsel for appellant]: The answer

would be hearsay, except only a dying declaration. The Court: I think it would be hearsay unless you are going to introduce a dying declaration. [The prosecuting attorney]; We'll just wait then." After a few questions had been asked and answered, the court, interrupting the examination, said: "It might be part of the res gestae. I think it probably would be. I think I'm going to reverse myself if he wishes to ask that question. I'm going to reverse that. Mr. Bezemer would you state what the person on the road said to you? [To defendant's counsel]: That may go in over your objection." The witness said he had asked Etherton what had happened and Etherton had said: "I been shot." Said the court: "I think you ought to ask him to give all the conversation. A. I said 'Who shot you?' He said 'Frank.' I said, 'where does he live?' He said 'lives in a trailer court, Indian Trailer Court, or something like that.' Q. Did he say how long he had been out on the road? A. He said between two and half to three hours." The witness said that while he talked to Etherton nothing was said as to where Etherton had been when he was shot and that the witness had not asked him that.

The next witness whose testimony is pertinent here was one of the two officers whom Johnson had summoned. The officers had come together. Kalakian was the superior and a police sergeant of the Sonora Police Department. His companion, Shelton, was a patrolman. Kalakian said that they found Etherton "lying there [in the road] in a lot of blood. He was covered with blood." The following then occurred: "Q. Now, did you talk to the man at all on the road? A. I did. Q. And what did he say to you? A. I asked him what happened to him. [Counsel for appellant]: I take it we can make the same objection and have the same exception? The Court: I will overrule the objection." The witness then stated that he had asked Etherton what had happened and had been told that he had been shot. The witness continued: "I said 'how many times and where?' He said 'three times in the guts.' I said, 'Who shot you?' He said, 'Frank.' I said 'Frank who?' He said, 'I don't know his last name.' I said, 'Where does he live?' He says, 'He lives in a trailer house in the Indian Camp.' When I got that information, I asked, 'What else happened?' He said, 'Then he tried to finish me off with a rock, bash me in the head with a rock, finish me off.' Officer Shelton was there. He kept questioning him while I went to telephone for the ambulance." He stated that Etherton was still conscious when he returned, but he

remembered no further statements. "Q. How long was it from the time you summoned the ambulance until the man was taken away by the ambulance? A. Not very long. I would say ten or fifteen minutes possibly. Q. Was the man conscious at the time he was loaded into the ambulance? A. He was." On cross-examination he added: "One thing I forgot to mention. I said, 'why did he shoot you?' He said, 'He claimed I robbed him of $80.00, but I didn't.' Q. He mentioned a figure? A. Yes. Q. $80.00? A. Yes." When asked if Etherton mentioned where he, Etherton, had been when the shooting took place, the witness said he remembered nothing of that. On redirect he supplemented Etherton's statement by saying that Etherton had told him appellant had shot him with a pistol. Officer Shelton followed Kalakian to the stand. He said Etherton was lying on a rock that was covered with blood. He was then asked to relate the conversation he had with Etherton. No further objection was made at that time to the introduction of that evidence. Shelton testified as follows: "Well, the first thing that was asked him was 'What happened?' And he said that he had been shot, and then he was asked 'Where?' and he said 'In the guts.' And 'how many times?' and he said 'Three times,' and then he was asked 'Who shot you?' and he said, 'Frank.' The next question was 'Frank who?' and he didn't know the last name. He said, 'I don't know,' and then the next question was 'Where does Frank live?' and his answer was 'In the Indian Camp in a trailer house.' " Said the witness: "There is one thing I would like to add there. When he said he was shot, he said, 'and he tried to finish me off with a rock in the head.' " The witness said that when Etherton was asked what he had been shot with he said he had been shot with a pistol and when asked where he was when he had been shot Etherton replied that he had been in bed when he was shot. On cross-examination the witness stated with regard to elapsed time that he and Kalakian had been contacted in front of the Sonora Inn at 5:10 a.m., December 5, 1954; that when the ambulance was called it was 5:15; that the ambulance arrived at 5:28; that Etherton was alive when he entered the ambulance.

In a statement made by Officers Kalakian and Shelton to Police Chief Campbell, which report, signed by both officers, was later introduced into evidence upon the theory that it constituted past recollection recorded, there was the following statement: "The victim was lying in a pool of blood,

and good deal of smeared blood near where his pants was found. The pants was also soaked with blood. A bloody rock was found under the victim's left hip, with which the victim claimed Frank had used to beat him on the head, trying to finish him off.''

We think the court erred in admitting in evidence the statements of Etherton, and that nothing occurred thereafter to cure the error. As we have noted, when the subject was first touched upon counsel for the appellant objected that the statements were hearsay unless brought within the dying declaration exception to the hearsay rule. This objection was sustained by the court. Quickly thereafter, however, the court announced that it would permit the statements as being part of the ''res gestae.'' By this we feel sure the court referred to spontaneous declarations, rather than verbal acts. Wigmore, 3d edition, volume 6, section 1745, at page 132, discusses the distinction and quotes the following from *Keefe* v. *State*, 50 Ariz. 293 [72 P.2d 425]:

''There has been such a confusion of ideas and such indiscriminate use of the words 'res gestae' that it is almost impossible, on reading the decisions involving this question, to discover the real extent of the exceptions and the principles involved therein. The phrase 'res gestae' means literally 'the thing done' and it is used in law as meaning the circumstances which are the automatic and undesigned incidents of the particular act in issue, and which are admissible in evidence when illustrative and explanatory of the act. The phrase is frequently applied to statements or explanations made in regard to an act in question by witnesses thereof.

''Such statements or explanations, however are properly divided into two classes, and the admissibility of the respective classes is based upon entirely different principles of law and logic. They may be defined as 'spontaneous exclamations' and 'verbal acts.' It is generally due to a confusion of these two classes of evidence and the principles governing their admissibility that the conflict between the many apparently irreconcilable decisions has arisen.

''A spontaneous exclamation may be defined as a statement or exclamation made immediately after some exciting occasion by a participant or spectator and asserting the circumstances of that occasion as it is observed by him. The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced in a spectator which stills the reflective faculties and removes their control,

so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled combination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him.

"Verbal Acts are utterances which accompany some act or conduct to which it is desired to give a legal effect. When such act has intrinsially no definite legal significance, or only an ambiguous one, its legal purport or tenor may be ascertained by considering the words accompanying it, and these utterances thus enter merely as a verbal part of the act. . . ."

As to the conditions under which spontaneous declarations may be admitted, the authority referred to says in section 1749, at page 139:

". . . [T]he statement must have been made under circumstances calculated to give some special trustworthiness to it, and thus to justify us in exempting it from the ordinary test of cross-examination on the stand. This principle is represented, in the present Exception [spontaneous statements], by the phrase, often repeated, that the statement must from the circumstances 'derive a degree of credit independently of the declaration,' i. e. other than the faith to be given to an ordinary extrajudicial assertion. This circumstantial guarantee here consists in the consideration, already noted (*ante,* sec. 1747), that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief. The utterance, it is commonly said, must be 'spontaneous,' 'natural,' 'impulsive,' 'instinctive,' 'generated by an excited feeling which extends without let or break-down from the moment of the event they illustrate.' . . ."

After quoting from many decisions, Professor Wigmore (§ 1750, p. 142 et seq.) summarizes as follows:

"From the judicial expositions the following limitations, and these only, may legitimately be deduced:

"(a) *Nature of the occasion.* There must be some occurrence, startling enough to produce this nervous excitement and render the utterances spontaneous and unreflecting.

. . . . . . . . . . . .

"(b) *Time of the utterance.* The utterance must have been *before there has been time to contrive and misrepresent,* i. e. while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. This limitation is in practice the subject of most of the rulings.

. . . . . . . . . . . . .

"Furthermore, there can be *no definite and fixed limit* of time. Each case must depend upon its own circumstances: . . .

"Thus the application of the principle thus depends entirely on the circumstances of each case.

. . . . . . . . . . . .

"(c) *Subject of the utterance.* The utterance must *relate to the circumstances of the occurrence preceding it.*"

■ As we have noted, the trial court admitted Etherton's statements over objection and at a time when it had before it only the bare facts that Etherton had been killed by gunfire, and the testimony of the autopsy surgeon which indicated that in the witness' opinion little time elapsed between the entrance of the bullet that severed the hepatic artery and ensuing profound shock and death. The witness' testimony on this did not exclude the possibility of the lapse of considerable time. Before admitting the extrajudicial statements it was the duty of the trial court to preliminarily go into and receive available evidence touching the quality of the statements as coming within the spontaneous statement exception to the hearsay rule. This was not done and over objection the conversations held with Etherton were admitted. Twice the objection was made and twice it was overruled. While it was not repeated as to succeeding witnesses, it is not to be held that the objection was thereby waived. Without there being any attempt to qualify the hearsay statements, other than such qualification as was furnished by the testimony of the autopsy surgeon, the extrajudicial statements were admitted as spontaneous declarations. The statements themselves contained much from which it could be inferred that they were not qualified as spontaneous declarations. They were made in response to questions; they were made over a considerable period of time; they indicated at least this much reflection, that when Etherton was asked why appellant had shot him he had replied that appellant claimed he, Etherton, had robbed him of $80, but that the charge was not true. It certainly could be inferred from the defensive matter included in Etherton's extrajudicial statements that he was protecting himself from a charge that might be made that he had

burglariously entered the trailer house of appellant with intent to rob him. If there had been an inquiry into the qualifications of the extrajudicial statements as being either dying declarations or spontaneous declarations, the matters later appearing in the case would have been revealed. It would have been revealed that Etherton had said he had been shot in bed, by which he must have meant his bed in the lean-to contiguous to appellant's trailer, indicating again a considered defensive statement against a possible charge of burglarious entry. On this point it is the claim of the prosecution that Etherton could not have been shot, as he said he was, in his bed. In short, the prosecution finds itself arguing that there was fabrication in fact in Etherton's extrajudicial statements. It would have been further revealed that Etherton said he had been lying on the highway for two and a half to three hours, a period of time affording ample opportunity for reflection and for fabrication. Etherton's statements also conflict with the inferences to be drawn from the autopsy surgeon's testimony as to the length of time Etherton could have lived and spoken after the severance of the hepatic artery. If it be considered that he falsified when he said he had been shot in his bed, then he had had time enough to fabricate, for fabricate he did. We think from a consideration of all of the testimony in the record when the ruling was made that the extrajudicial statements of Etherton should not have been received.

When at the close of the evidence the cause was submitted to the jury all of the evidence we have related touching the admitted statements as properly qualified spontaneous statements had been received. The question of whether or not these statements qualified as spontaneous declarations was clearly and seriously at issue. ██ Research has not disclosed any ruling by the appellate courts of this state on the subject of whether or not, when conflicting evidence has been received or conflicting inferences can be drawn touching the matter of qualification of spontaneous statements, the ruling of the trial court admitting the statements is final, or, on the contrary, whether or not that issue must be resolved by the jury under instructions by the court defining spontaneous declarations and telling the jury how they are to determine whether or not the statements were qualified; and that if they find them not to have been qualified they are to disregard them. However, we think the issue must be submitted to the jury. We think the ruling of the trial court is preliminary

only and that the jury must ascertain the ultimate fact of admissibility before it can consider the evidence. ▮ We can see no difference between the issue of admissibility of spontaneous declarations and the issue of admissibility of dying declarations. Both sorts of declarations can only be admitted as exceptions from the exclusionary hearsay rule. Both sorts of declarations are hearsay and both, if the conditions for admission are found to exist, may nevertheless be received in evidence. The proper procedure as to dying declarations and the rule as to who shall ultimately determine if the declarations are dying declarations is well settled in this state. ▮ In *People* v. *Singh,* 182 Cal. 457, 476 [188 P. 987], it is said:

''The weight of authority in respect to the relative functions of the court and the jury touching the admission and determination of dying declarations is that the court alone shall pass on the admissibility of this character of evidence, and that the jury shall exclusively determine its probative value. . . . Whatever the law may be in other jurisdictions, it is well-settled in this state that it is the function of the trial court primarily to pass upon the admissibility of the alleged dying declarations and of the jury to determine whether they were in fact made under a sense of impending death, and, if so, then to determine the credibility and weight to which they are entitled. If the jury is not convinced beyond a reasonable doubt that the declarant was *in extremis* and believed at the time that he was, they must, in arriving at their verdict, disregard such declarations. But if, on the other hand, the jury are satisfied beyond a reasonable doubt that the declarant acted under a sense of impending death, they must then determine what facts, if any, are established by his declarations and apply them accordingly. (*People* v. *Glenn,* 10 Cal. 32; *People* v. *Lem You,* 97 Cal. 224 [32 P. 11]; *People* v. *Thomson,* 145 Cal. 717 [79 P. 435]; *People* v. *Profumo,* 23 Cal.App. 376 [138 P. 109]; Greenleaf on Evidence, sec. 161.)''

Under the circumstances, therefore, we hold that it was incumbent upon the trial judge, having admitted the statements, to submit to the jury under appropriate instructions the ultimate determination as admissibility with instructions that they were to disregard the statements if they determined them not to have been spontaneous declarations. This was not done.

Upon the subject we have just been discussing the record presents a puzzling situation. Although the statements of

Etherton made to the two arriving witnesses and to the two officers and containing so much that was damaging to appellant were by the trial court ruled out when first offered as constituting dying declarations and then admitted upon the theory that they were spontaneous declarations, yet both sides requested that the court give to the jury the instruction found in CALJIC and therein appearing as Number 330, reading as follows:

"Evidence has been received tending to show that the deceased made a statement concerning the circumstances under which he received the injuries which later caused his death. The evidence of that statement may not be considered and must be entirely disregarded by you unless you find from all the pertinent evidence that at the time the deceased made the statement, he was under a sense of impending death, that he then believed that he was going to die from the injuries thus inflicted, and that he then had no hope of recovery from such injuries. If the statement was made under the conditions I have specified, the jury may and ought to consider it as evidence, . . ."

If this instruction had been given at the request of the People only, error would have to be declared because the objection of the defense that the declarations of Etherton had not been qualified as dying statements had been sustained by the court. And since thereafter no further attention was paid to the statements as perhaps constituting dying declarations the defense had had no opportunity to present evidence bearing upon the nonexistence of a belief upon the part of Etherton that his death impended and that he had no hope of recovery. But the defense also asked that the same instruction be given. What occasioned this mutual request does not appear in the record.

It was error for the trial court to submit to the jury the issue as to whether or not the statements admitted in evidence constituted dying declarations of Etherton. ▪ Whenever a dying declaration is offered in evidence the burden is cast upon the one offering the same to establish primarily that it possesses the qualifications of such a declaration. To do this the offeror must establish that the declaration was made under a sense of impending death, that the declarant believed he was going to die from his injuries and had no present hope of recovery therefrom. Preliminarily, it is for the court to determine the admissibility of the proposed declaration and it is the duty of the court to inquire into the facts

and circumstances under which the declaration was made and to offer opportunity, if requested, to the party opposing the admission of the declaration to disprove its admissibility. In this case the only time when the question of the admissibility of Etherton's statements as dying declarations was questioned the court sustained defense objections that they were not admissible. Certainly it could not be said that at that time the trial court abused its discretion in determining that the statements were not admissible as dying declarations. It had before it only the testimony of the doctor that in his opinion Etherton was gravely wounded and probably would soon, after receiving the wound that severed the hepatic artery, pass into profound shock and speedily expire. There was no other attempt by the prosecution to prove that Etherton knew his condition or that he believed he had been mortally wounded. And the prosecution acquiesced in the court's ruling. When the statements had been received they themselves afforded much persuasion that he did not know of the gravity of his wounds and he did not believe that he was about to expire, much less that he had no hope of recovery, for, as we have noted, his statements were those of a man seeking to shield himself from the consequences of appellant's charge that he had stolen money from appellant. ▮ We have no hesitancy in declaring that at the close of the evidence, and as a matter of law, the statements of Etherton could not be considered as dying declarations. It was, therefore, error to tell the jury that they could independently pass upon that issue and from the evidence could determine that his statements were dying declarations and so determining could consider them as evidence in the cause, testing their credibility, of course, under the rules given them for that purpose and applicable to all evidence before them. But, as we have said, both the prosecution and the defense requested the court to give this instruction and, therefore, it is apparent that the error, so far as the defense is concerned, is open to the charge that it was invited error of which they cannot complain. Nevertheless, error is nonetheless error and is no less operative on deliberations of the jury because the erroneous instruction may have been requested by counsel for the defense. After all, it is the life and liberty of the defendant in a case such as this that is at hazard in the trial and there is a continuing duty upon the part of the trial court to see to it that the jury are properly instructed upon all matters pertinent to their decision of the cause. ▮ It is not every case in

which invited error will free the trial from the challenge that such error caused or contributed to a miscarriage of justice. The jury were told that it was for them to determine whether or not they were dying declarations. We cannot say, as a reviewing court, that the jury may not, incapable as they were of testing these statements by the somewhat technical rules of law governing their admission, have considered them to be such, and if they did, then there was injected into the trial considerations that ought not to have been before the jury. In summation upon this matter of the statements of Etherton, it is our view that these statements ought not to have been introduced in the cause either as dying declarations or as spontaneous declarations and that their injection into the cause must have been seriously detrimental to appellant's defense.

Appellant contends that the trial court committed prejudicial error in admitting into evidence the written report which the two investigating officers made to their chief. We think this contention must be sustained. This document was admitted after cross-examination of Officer Shelton, the last to testify of the four witnesses who saw Etherton as he lay upon the highway. The two arriving witnesses, Johnson and Bezemer, had said that they could not by any means describe the figure they had seen stooping over Etherton and later ascending and disappearing over the bank of the highway; that they could not be certain whether it was a man or a woman they had seen and could only say that it wore a long overcoat. They had given their reasons for this, that is, that it was dark, they did not get a good look, and were concerned with the man lying in the road. Of course, and properly enough, neither of the officers *testified* that either Johnson or Bezemer had made statements to them contradictory to their direct statements on the stand, nor was any effort made to impeach either Johnson or Bezemer upon the ground that he had made such statements. Nevertheless, the typewritten and signed report which the two officers gave to their chief contained this matter: "Mr. Harry Johnson stated that he saw a man running from the scene when they first discovered the victim. Mr. Johnson described the man as being elderly, slender built, and wearing glasses." Appellant was an elderly, slender man who wore glasses, and the sentence we have quoted from the typewritten report was the only evidence of a descriptive nature that identified appellant with the figure seen bending over Ether-

ton. Appellant denied that he had approached Etherton on the highway or that he had been the person seen climbing the bank and disappearing from the roadway. When counsel for the appellant cross-examined Officer Shelton he sought to develop that there were certain things testified to by him that had been omitted from his *official* report, and Shelton, evading this charge of omission, stated that the things inquired about had been contained in his *unofficial* typewritten report to the police chief; that he had this typewritten report in his pocket where he had had it for several days and that the matters inquired about did appear in that report. On counsel's request the officer produced the report and counsel called his attention to the sentence containing the detailed description of appellant which we have quoted above. The following occurred: "Q. I want you to read to yourself, if you will, this paragraph right there, starting 'Mr. Harry Johnson' and ending with that word. Just read it to yourself if you will. A. Yes, sir, that is what he said. Q. What you have got here in this report is this: 'Mr. Harry Johnson stated that he saw a man running from the scene when they first discovered the victim. Mr. Johnson described the man as being elderly, slender built, and wearing glasses.' That is tailor-made for this defendant, isn't it? A. It could be. Q. Tailor-made—slight, elderly, and wearing glasses. A. It could fit him. Q. It sure could, couldn't it? As a matter of fact, Mr. Johnson didn't tell you any one of the things in the report. A. Yes. He said he was wearing a long overcoat, and if I've got it in the report, he must have said something about the rest of it. Q. He doesn't say one word in your description about a long overcoat, and you told me a minute ago the best description he could give was a man wearing a long overcoat. A. Yes. I remembered that long overcoat. Q. You told me just a little while ago he didn't mention any of these things about being elderly, or slightly built, or wearing glasses. Isn't that a fact—about two minutes ago? A. I said I didn't remember, I believe. I think I said I didn't recall that." Upon redirect the prosecuting attorney offered the report in evidence as an exhibit upon the basis that it represented past recollection recorded. Its receipt into evidence was objected to upon the ground that it was hearsay; the objection was overruled and the document was received in evidence. ■ A writing used to refresh the recollection of a witness does not by such use become itself admissible as evidence in the cause. (*Estate of Packer,* 164

Cal. 525, 530 [129 P. 778].) We quote the following from that decision:

". . . Even if it be assumed that the circumstances were such as to authorize the use of the letters to refresh the witness' recollection . . ., the party calling her was not thereby authorized to put the papers before the jury. Such a paper is 'in no sense testimony. . . . The opponent, but not the offering party, has a right to have the jury see it. . . . That the offering party has not the right to treat it as evidence, by reading it or showing it or handing it to the jury, is well established.' (1 Wigmore on Evidence, § 763.) And such seems to be the fair construction of section 2047 of the Code of Civil Procedure, which expressly declares the right of the *adverse party* to read the writing to the jury. . . . To permit this to be done by the party producing the witness would open the door to the admission of hearsay and manufactured evidence without limit." (See also *Estate of DeLaveaga,* 165 Cal. 607 [133 P. 307] ; *People* v. *Lanterman,* 9 Cal.App. 674 [100 P. 720] ; *Hawkins* v. *Sanguinetti,* 98 Cal.App.2d 278 [220 P.2d 58].)

Seeking to justify the introduction of this document in evidence, the attorney general here argues as follows: "The witness testified in effect that the contents of the report were accurate; that the report was made shortly after the occurrence of the offense related therein, and that at the time of the trial he had no independent recollection of the contents of the report. ██ The rule is that a written memorandum which contains a statement of facts which were fresh in the writer's mind at the time [of] the memorandum may be introduced in evidence as past recollection recorded if the witness at the time of the trial testifies that after looking at the memoranda he is unable to refresh his memory therefrom and is unable to testify independently concerning the facts stated in the memorandum." We do not read the record as being in accord with these statements as to its contents nor as measuring up to the rule relied upon. The following occurred: "Q. I will ask you this, Mr. Shelton. . . . How much of your testimony that you gave here in Court yesterday and today is based upon this report? A. Quite a bit of it. Q. How much of the testimony that you have given is based upon your independent recollection of events as they happened? A. I believe it's about half and half. . . . Q. How much of the testimony that you have given, Officer, relative to the statements of either the deceased or Mr. Keelin is based

upon your accurate memory at this time of what happened, or upon any report you made, or any discussion you had with other officers? A. I tried not to talk about it to other people, because I don't think that's right—people that weren't involved in the case. . . . Q. You are quite sure all of these items you have mentioned here—this very definite description, was given to you on that morning by Mr. Johnson?. A. That was given to Sergeant Kalakian and I. Q. You are quite sure? A. As far as I know, yes, sir. Q. Were you mistaken then in your testimony a little while ago when you stated Mr. Johnson told you the man was going up the bank and had an overcoat on and he couldn't see much else because he went out of sight? A. I hadn't read that report for quite a while, so I didn't recall that. Q. How long has it been since you read the report? A. Two or three days. . . . Q. Now, Mr. Shelton, as I understand it, this all took place December 5. It's now March 3, is it not, or March 2, three months ago. A. Yes. Q. Now, when Mr. Gorgas [Counsel for appellant] talked to you about that and you got it out of your pocket and he mentioned the statement that Mr. Johnson had stated that he saw a slightly built man with glasses and a long coat leave and go up a bank, does that refresh your recollection? A. After I read this. Q. Do you now recall whether Mr. Johnson actually told you those things? A. The way I remember it he says that he may have been wearing glasses. He seen a flash or something of light. I don't recall the exact words, but I got it down in the report.''

 In our view the foregoing will not support a claim that the witness had no recollection at the trial independently of the memorandum or of the contents thereof. The document was inadmissible and its admission may well have gravely prejudiced the defense. For instance, in addition to the paragraph in which was contained the description of the figure as being ''elderly, slender built and wearing glasses'' there was the following matter which had not been theretofore testified to: ''A bloody rock was found under the victims left hip, with which the victim claimed Frank had used to beat him on the head, trying to finish him off.'' Up to that time and on this subject there had been testimony that Etherton had claimed Frank had tried to finish him off with a rock, but there had been none in which he referred to a certain bloody rock found under his left hip and identified as the rock with which appellant had tried to ''finish him off.'' The significance of this additional hearsay statement

not otherwise introduced in evidence can hardly be minimized when we recall again that it was the theory of the prosecution that the fatal shots had been fired and the beating had occurred after the affair in the trailer house had been closed out by the departure of Etherton, and at a time when appellant had followed Etherton down to the highway. It is also passing strange that if Etherton claimed that the bloody rock found under his left hip was the one with which he had been beaten by appellant, it was never brought to the trial and placed in evidence as an exhibit. Such treatment of the memorandum ''spotlights'' the direct testimony of its maker; and the memorandum may, along with other exhibits, find its way into the jury room and its effect thus be magnified out of all proportion to the oral testimony of the various witnesses.

Appellant contends that the trial court erred in admitting in evidence, over his objection, testimony given by him before the coroner's inquest. In examining this contention it should be stated that appellant was arrested early in the morning of December 5th and was kept in custody until the inquest was held on December 9th at 7:30 in the evening. During that time he had asked for and had been denied counsel. He was produced at the coroner's inquest by the officers in whose custody he had remained, was sworn as a witness and questioned at considerable length by the sheriff, by the district attorney and by one or more coroner's jurors. He had at no time been informed of his right to counsel nor had he been taken before a magistrate who might inform him thereof. In fact, he testified that it was during this period he demanded to be allowed to have an attorney and was told by his custodians that the district attorney was his attorney. There appears to be no denial in the record that this occurred. During the trial the People called the sheriff to the stand and began to question him concerning statements made by appellant at the inquest. Objection was made, based on the facts and circumstances we have related, that to permit these statements to be used would violate the appellant's constitutional right not to be compelled to be a witness against himself. The objection was overruled. Although a transcript of the testimony before the coroner was not admitted in evidence, the sheriff was questioned at some length as to the questions asked the appellant at that inquest and as to the appellant's answers to the questions. There can be no doubt from the record that a great deal of his testimony before the coroner was thus introduced into the

record, it being the theory of the district attorney that the objection was not good as against admissions. He said, ''It was my understanding admissions could be introduced even if extracted by force.'' The use of these statements was error. The matter is covered by the case of *People* v. *O'Bryan,* 165 Cal. 55, 61 [130 P. 1042]. In that case the statements used were elicited from the defendant when he had been taken before a grand jury. We see no difference insofar as the protection of the Constitution be concerned. The Supreme Court said:

''The testimony should not have been admitted. The course pursued was in violation of the constitutional right of every person not to 'be compelled, in any criminal case, to be a witness against himself.' (Const. Cal., art. I, § 13.) The defendant could not, of course, have been called and required to testify against himself at the trial. The guarantee against being so compelled would be of little value if the same result could be attained by the indirect method of compelling him to testify at some antecedent step of the proceedings against him and then offering in evidence his statements so extracted. We do not mean to suggest that under no circumstances can testimony given by a person before a grand jury be given in evidence in a subsequent trial of a criminal charge against him. The constitution protects a person from being *compelled* to be a witness *against himself.* If, at the time he appears, no accusation, formal or informal, has been made against him, he does not, in testifying, become a witness against himself. Or if, even though charged with crime, he voluntarily gives evidence against himself, his rights are not infringed by the use of such evidence thereafter. These distinctions are well illustrated by a series of New York cases [citing cases], the result of which is summed up in *People* v. *Molineaux,* 168 N.Y. 331 [62 L.R.A. 193, 61 N.E. 308], in these words: 'When a person testified at an inquest as an accused or arrested party, his testimony cannot be used against him upon a subsequent trial of an indictment growing out of the inquest, unless his testimony has been *voluntarily* given after he has been fully advised of his rights and has been given an opportunity to avail himself of them.'

''Here the defendant, when brought before the grand jury, was in custody under an accusation of guilt of the crime under investigation. Taken into the presence of that body by the sheriff, sworn and examined without the aid of counsel, and without any instruction as to his rights, it

cannot be said that his submission to the interrogation was in any fair sense voluntary. The great preponderance of authority is that testimony so given by a defendant is not to be used against him.''

It has been frequently held that a defendant, subpoenaed to testify before a grand jury, who appeared and answered questions in regard to matters on which he was later indicted could have the indictment quashed on application to the court because it was deemed that being subpoenaed to testify before a grand jury investigating a charge or a proposed charge against him was such compulsion that the Constitution was violated. These cases are collated in an annotation appearing in 38 American Law Reports, 2d, pages 225, 300-301. We have no doubt that under the circumstances disclosed by this record the use of appellant's statements before the coroner at his trial was a violation of his constitutional rights. In saying this we consider what occurred after the coroner's inquest was held. When he testified before the coroner he had been in custody four days, during which time he had been frequently questioned by the police officers and by the district attorney. They continued to hold him in custody in violation of his right to be taken before a magistrate, to have an attorney and to be informed of his rights, for an additional seven days, at which time he was taken before the grand jury and again examined by the district attorney and various grand jurors. During that examination he was questioned regarding inconsistencies between statements to the grand jury and statements he had made to the coroner. His indictment followed. Appellant did not seek to appear before either the coroner or the grand jury and it is apparent that he did no more than ignorantly submit to being haled about by his custodians. It was not until 12 days after his arrest and detention that he was arraigned in the superior court and counsel was appointed to represent him.

Appellant contends that his long detention without benefit of counsel and his being compelled to testify against himself before the coroner and before the grand jury while that body was investigating the charge of murder proposed to be placed against him so prejudiced his defense as to amount to a denial of his constitutional right of due process. In addition to what has been heretofore discussed, appellant, in support of this contention, further argues that delay in obtaining counsel deprived him of any representative who could act in his behalf while the facts surrounding the killing of Etherton

were still fresh. The truth of this observation cannot be denied. ▮ The purposes of the statutes which require that a person detained be taken before a magistrate at the earliest practicable moment, which provide penalties if counsel be denied when counsel have been requested, and which punish a refusal to permit counsel to talk with the person detained, are all to provide early representation if it is desired. ▮ We think it highly improbable that, had appellant's request for counsel been heeded, he would have been a witness either before the coroner or before the grand jury. The conduct of the prosecuting attorney and of the police officers cannot be too strongly condemned in this respect. (It should be said here that the district attorney in office when these things happened was not in office when the trial was had.) It is altogether likely that had they kept their oaths to support the Constitution of this state and of the United States and had they kept their oaths to perform their duties under the law this trial would have had a different complexion. We cannot measure the prejudice to appellant; we cannot even say with certainty that prejudice was suffered; but we can be sure that such conduct will not receive the sanction of this court.

For the reasons given, the judgment and the order appealed from are reversed.

Peek, J., and Schottky, J., concurred.