[Civ. No. 24313.   First Dist., Div. Four.   June 30, 1969.]

BARBARA McCLAFLIN, et al., Plaintiffs and Appellants, v. BAYSHORE EQUIPMENT RENTAL COMPANY et al., Defendants and Respondents.

448

Gudmundson, Siggins, Stone & Goff and Charles E. Goff for Plaintiffs and Appellants.

Clifford Burnhill, Burnhill, Rode, Moffitt & Moore, John J. Quill and Cyril Viadro for Defendants and Respondents.

RATTIGAN, J.—Neil McClaflin died from injuries received in an accident involving a stepladder he had leased from Bayshore Equipment Rental Company, a partnership. His heirs brought this wrongful death action against Bayshore and the partners therein. The jury returned a defense verdict. Appealing from the judgment, plaintiffs contend that

the trial court erred in declining to instruct the jury on "strict liability." We agree: we reverse the judgment.

The evidence shows the following facts, none of which are in substantial dispute: The decedent was self-employed as an installer of custom draperies. The accident occurred while he was working on a job in a room of the Hillsdale Executive Building in San Mateo. Before commencing work on the afternoon of the accident, he personally rented a folding wooden stepladder from Bayshore at the latter's business premises nearby, drove it to the Hillsdale Executive Building, and set it up in the room where he was to install rods and draperies. He mounted the ladder in order to drill holes in the ceiling of the room. Shortly after he had reached a standing position on a step near the ladder's top, the ladder and he fell to the floor. He received head injuries, from which he died in Mills Memorial Hospital two days later.

Timothy Ward, an employee of the decedent, had accompanied him during the rental transaction and to the job site. Ward was present when the accident occurred, but he did not see it because he was "bending over" while working nearby. Hearing a crash, Ward turned and saw the decedent and the ladder lying on the floor. He realized that the decedent was unconscious, and ran for help. Several persons, including a police officer, came to the scene. After the accident Ward noticed some vertical "cracks," about 3 feet in length, in one of the step-bearing legs of the ladder.[1] The jury saw these cracks. The stepladder was received in evidence at the trial.

Plaintiffs' complaint set forth causes of action for negligence and breach of warranty against Bayshore and its partners. Defendants pleaded, among other things, contributory negligence and assumption of risk by the decedent. The principal controversy at the trial pertained to the cracks in the stepladder. Plaintiffs undertook to prove that the ladder was cracked when the decedent rented it, and that the defect caused it to collapse and him to fall. Defendants offered evi-

---

[1] For present purposes, the ladder may be described as of conventional folding-stepladder design with two pairs of legs hinged together at the top and connected at a lower point by folding lateral braces on each side. It was an "8-foot" ladder, meaning it was 8 feet long in a folded position. When it was unfolded and erect in an inverted "V" position, the top of the ladder stood slightly short of 8 feet from the floor. The "cracks" were in the lower half of the left-hand step-bearing leg of the ladder.

dence that the decedent caused the ladder to fall by the manner in which he stood on it and worked from it, and that the leg was cracked in the fall. Four experts—one for plaintiffs and three for defendants—testified on this subject.

Photographs and other evidence showed that Bayshore conducted its business in a large warehouse-type building which was open to the public during business hours. The building, which occupied a street corner, was conspicuously signed with legends advertising the business ("Bayshore Equipment Rental," "Tools, Equipment Rented," and so on); at least two exterior signs advertised "Ladders." Bayshore rented a varied line of ladders, tools and powered equipment to customers who called for the rented items and took them from the premises. The business was ordinarily manned by four employees, who served as many as 150 rental customers per day in peak times. The rented ladders were both new and used; one of Bayshore's employees testified that the stepladder rented to the decedent was "one of our older ladders."

Plaintiffs proposed a "strict liability" instruction, patterned after BAJI No. 218-A (new) (BAJI [1967 pocket part] p. 111) but directed to strict liability in Bayshore as the *lessor* of the stepladder.[2] The trial court refused to give it. We hold that the omission was prejudicial error.

■ It is now well established that a person is strictly liable in tort when an article he places upon the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62-63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 260-263 [37 Cal.Rptr. 896, 391 P.2d 168]; *Alvarez* v. *Felker Mfg. Co.* (1964) 230 Cal.App.2d 987, 994-996 [41 Cal.Rptr. 514]; Prosser, *Strict Liability to the Consumer in California* (1966) 18 Hastings L.J. 9.) *Greenman* applied the rule against a manufacturer, *Vandermark* and *Alvarez* against retailers. No California decision has yet applied it against the lessor of a chattel. We do so here.

---

[2] Plaintiff's instruction read as follows: "A business entity that rents a ladder or places it on the market for rent or lease under circumstances where it knows that such ladder will be used without inspection for defects, is liable for injuries caused by defects in the ladder of which the user was not aware, provided the ladder was being used reasonably for the purpose for which it was rented and intended to be used."

Defendant's argument to the contrary is based upon Civil Code section 1955 (relative to the obligations of a lessor of personal property)[3] and certain decisions construing it. (E.g., *McNeal* v. *Greenberg* (1953) 40 Cal.2d 740, 742 [255 P.2d 810]; *Tierstein* v. *Licht* (1959) 174 Cal.App.2d 835, 841 [345 P.2d 341].) Defendants urge that under these decisions a lessor or bailor of personal property in California can be held liable for negligence only; this means, they contend, that such lessor—"as distinguished from a manufacturer, distributor or retailer"—cannot be held strictly liable in tort under the *Greenman* rule.

Section 1955, however, does not state this conclusion: the Legislature in enacting it defined certain duties of a lessor of chattels, but did not purport to limit his liabilty to breaches thereof. Moreover, the pre-*Greenman* cases construing the statute established that the lessor's liability to his customer rested in contract: it was for his breach of *an implied warranty,* arising under section 1955 or under the common law of bailments, that he had exercised reasonable care to ascertain that the leased chattel was safe and suitable for the purpose for which it was hired. (See, e.g., *McNeal* v. *Greenberg, supra,* 40 Cal.2d 740 at p. 742; *Tierstein* v. *Licht, supra,* 174 Cal.App.2d 835 at p. 841.)

But it is the element of *warranty* that the *Greenman* rule wholly abolished as a foundation of liability in the purveyor of a defective chattel (Prosser, *op. cit. supra,* 18 Hastings L.J. 9, 20 ["It is warranty that has gone overboard, and with it all idea that the plaintiff's recovery is founded on a contract, . . ."]); and this is demonstrated by the more recent, but corollary rule, that a plaintiff can enforce strict liability in the absence of any contractual relation or privity of contract with the purveyor. (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 586 [75 Cal.Rptr. 652, 451 P.2d 84]; *Barth* v. *B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 246 [71 Cal.Rptr. 306].) The cases which held that a bailor's liability for his customer's injuries was based upon contract therefore do not protect him from strict liability under the *Greenman* rule, which reaches him in tort.

---

[3]"1955. One who lets personal property must deliver it to the hirer, secure his quiet enjoyment thereof against all lawful. claimants, put it into a condition fit for the purpose for which he lets it, and repair all deteriorations thereof not occasioned by the fault of the hirer and not the natural result of its use."

■ The *Greenman* rule, moreover, extends its protection to the injured party without reference to the role he played, or even if he played none, in the transaction wherein the defective chattel was acquired from its purveyor. He can be a retail buyer (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 59), a member of the buyer's family (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 258), the buyer's employee (*Casetta* v. *United States Rubber Co.* (1968) 260 Cal.App.2d 792, 795 [67 Cal.Rptr. 645]), or a "mere bystander" totally unconnected with the chattel's purveyor except as an ultimate victim. (*Elmore* v. *American Motors Corp., supra,* 70 Cal.2d 578, 586.) Defendants' argument would exclude only a lessee-bailee from the protected class. The exclusion, in our view, would ignore the marketplace realities upon which the *Greenman* rule rests.

■ Lessors of personal property, like the manufacturers or retailers thereof, "are engaged in the business of distributing goods to the public. They are an integral part of the overall . . . marketing enterprise that should bear the cost of injuries resulting from defective products." (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256 at p. 262.) In some cases the lessor "may be the only member of that enterprise reasonably available to the injured plaintiff" (*id.*), and the imposition of strict liability upon him serves, as in the case of the retailer, as an incentive to safety. (See *id.*) This will afford maximum protection to the injured plaintiff while working no injustice upon the lessor : the latter can recover the cost of the protection by charging for it in his business. (See *id.*, at pp. 262-263.) In sum, the rationale of *Greenman* and *Vandermark* applies as logically and desirably to a lessor of chattels as to the manufacturers or retailers thereof. (See Lascher, *Strict Liability In Tort For Defective Products: The Road To And Past Vandermark* (1965) 38 So.Cal.L.Rev. 30, 57 ["B"].)

■ Other factors supporting the application of strict liability in the present case are shown in *Cintrone* v. *Hertz Truck Leasing etc. Service* (1965) 45 N.J. 434 [212 A.2d 769]. The *Cintrone* court held a "U-Drive-It" lessor of trucks strictly liable because its business put "motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer"; this, the court reasoned, actually exposed the bailee and others to a greater risk from defective vehicles "than usually arises out of sales by the manufacturer." (*Id.,* p. 450.) The same is true here. As shown by the previously

discussed evidence pertaining to Bayshore's shop and business operations, the rental to the decedent was in the course of an active, full-time marketing enterprise; it was not a casual or isolated transaction. (See *Conroy* v. *10 Brewster Ave. Corp.* (1967) 97 N.J.Super. 75, 81-82 [234 A.2d 415] ; Rest.2d, Torts, § 402A, com. f.)

▉ Two of Bayshore's employees testified, as did Timothy Ward, concerning the transaction in which the decedent rented the ladder. Their testimony showed that the decedent himself selected the ladder, physically handled it himself at Bayshore's shop, and loaded it on his truck with Ward's help. There was no evidence that he inspected it for defects at any time before the accident, nor that other customers inspected rented ladders before using them. Whether Bayshore knew that the ladder would be used without inspection on this occasion was a question to be decided by the jury under the strict liability instruction proposed by plaintiffs.

Plaintiffs also challenge the trial court's exclusion of evidence which, as offered by them from various sources, purported to describe the cause of the accident. We discuss plaintiffs' contentions in these respects because of the prospect of a retrial. One source was a police officer to whom the decedent said, a few minutes after the accident, ''The ladder broke and I fell.'' The trial court rejected plaintiffs' offer of the officer's testimony to this statement as hearsay. Other sources were entries in the written record of the decedent's hospitalization. One of these read in relevant part that he ''fell off ladder . . . leg of ladder broke''; the others were of similar import. The final source was an entry in the county coroner's certificate of the decedent's death, of which plaintiffs offered a certified copy. The entry (under ''Describe how injury occurred'') read ''When leg of step ladder broke, victim fell, landing on head.'' The trial court admitted the hospital record and the copy of the death certificate, but with the mentioned entries excised.

▉ The evidence fairly shows that the decedent's statement to the police officer was made within about 15 minutes after the accident, during part of which interval the decedent had been unconscious; that he was dazed but coherent after having recovered consciousness, and spoke while still lying on the floor where he had fallen; and that he made the statement in response to questions of the ''what happened?'' variety from the officer, who was investigating the accident.

■ Upon retrial, the court should consider whether the decedent's statement is admissible as a spontaneous declaration: i.e., an utterance (1) made in nervous excitement produced by a startling occurrence, (2) made before there had been time to contrive and while the declarant's reflective powers were yet in abeyance, and (3) relating to the circumstances of the preceding occurrence. (*Showalter* v. *Western Pac. R. R. Co.* (1940) 16 Cal.2d 460, 468-470 [106 P.2d 895]; *People* v. *Bernalley* (1960) 185 Cal.App.2d 326, 329-330 [8 Cal.Rptr. 375]. See Witkin, Cal. Evidence (2d ed. 1966) The Hearsay Rule, §§ 544-547, pp. 516-522.) The first element was apparently present here (see *Showalter* v. *Western Pac. R. R. Co.*, *supra*, at p. 469); the third is clear from the declaration itself. The length of the time lapse preceding it, though significant, is not controlling. It was short; spontaneity more readily appears where, as here, the declarant had been unconscious during the time interval (see *People* v. *Costa* (1953) 40 Cal.2d 160, 168 [252 P.2d 1]), and it is not lost where the declaration was made in response to questions inquiring what had happened. (*Id.*; see *Wiley* v. *Easter* (1962) 203 Cal. App.2d 845, 854-856 [21 Cal.Rptr. 905].)

■ We must note, however, that the trial judge could have admitted the evidence of the declaration only *preliminarily* and that, had he done so, he would have been required to instruct the jury appropriately as to the "ultimate fact of admissibility." (*People* v. *Keelin* (1955) 136 Cal.App.2d 860, 871-872 [289 P.2d 520. 56 A.L.R.2d 355]; *People* v. *Bernalley*, *supra*, 185 Cal.App.2d 326 at p. 330.) This is not the law under Evidence Code section 405, but this case was and is not subject to that statute because the trial commenced prior to January 1, 1967 (Evid. Code, § 12, subd. (b)); accordingly, the prior law controls it as stated above. (*Id.*; see Witkin, Evidence, *supra*, § 544, par. [5], p. 518; *id.*, § 1092, par. [b], p. 1011.) This means that the evidence in question, if admitted at retrial, will require an appropriate jury instruction. (*People* v. *Keelin*, *supra*; *People* v. *Bernalley*, *supra*.)

■ The various entries in the decedent's hospital record were admissible only if their contents dealt with matters customarily included in such record, if the matters entered were within the personal knowledge of the entrant or of his informant, and if such person could competently testify thereto if present in court. (See Witkin, Evidence, *supra*, The Hearsay Rule, § 574, pp. 548-549; *id.*, §§ 576-578, pp. 550-553;

*id.,* §§ 583-584, pp. 556-557; authorities cited, *passim.*) We are unable to determine these questions on the present trial record; they may properly be determined at retrial. (See *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 126 [52 Cal. Rptr. 561, 416 P.2d 793].)

A certified copy of a coroner's death record is "prima facie evidence . . . of the facts stated therein." (Health & Saf. Code, § 10577.) We conclude, however, that the prefatory clause in the entry here ("When leg of step ladder broke,") does not state a fact: it is a *recital* of one, and the statute does not make the certified copy prima facie evidence of the fact to which the recital refers. Moreover, the ultimate facts to which the entry does refer, on its face, are the decedent's fall and the blow to his head. In context, the reference to "when leg of step ladder broke" reflects only the declarant's conclusion; as it qualifies the entire entry, the latter was inadmissible in the present case and the trial court correctly excluded it. (See *People* v. *Holder* (1964) 230 Cal. App.2d 50, 53-54 [40 Cal.Rptr. 655]; *Behr* v. *County of Santa Cruz* (1959) 172 Cal.App.2d 697, 704-706 [342 P.2d 987].)

Plaintiffs' remaining contentions on the appeal pertain to the use of demonstrative evidence and alleged misconduct by defendants' counsel. Such matters can be controlled at a retrial.

The judgment is reversed.

Devine, P. J., and Christian, J., concurred.

A petition for a rehearing was denied July 25, 1969.