[Civ. No. 19468.   Second Dist., Div. Three.   Feb. 25, 1954.]

SAMUEL REISMAN et al., Appellants, v. LOS ANGELES
CITY SCHOOL DISTRICT et al., Respondents.

Norman Pittluck for Appellants.

Henry R. Thomas, Wayne Veatch and Henry F. Walker for Respondents.

WOOD (Parker), J.—Action by parents for damages for wrongful death of their minor son, allegedly resulting from negligence of a public school district, board of education, and superintendent of schools in maintaining blacktop paving under playground equipment, and in supervising the play of the son, on the school grounds. In a trial by jury there was a general verdict for defendants, and there were three special interrogatories which were answered in favor of defendants. Judgment was for defendants. Plaintiffs appeal from the judgment.

The accident occurred at the Wilshire Crest public school, which is at the northeast corner of Olympic Boulevard and Orange Drive in Los Angeles. The school building is in the southwest corner of the school grounds. The playground adjoins the north and east sides of the building and is in the shape of an "L." The part of the playground east of the building is for the use of primary or first grade pupils. It is about 50 feet wide (east-west) and about 175 feet long. The other part of the playground (which is north of the building and north of the primary playground) is for the use of second, third, and fourth grade pupils. This will be referred to as the larger playground. The boundary line between those two playgrounds (that is, the north line of the primary playground) is the prolongation of the north line of the building. There is no fence between those grounds.

On March 16, 1949, Ronald Reisman, the son of plaintiffs, was 6 years and 8 months of age and was a first grade pupil in attendance at the school. At 1:30 p. m. of that day the teacher in the room where he was a pupil led the pupils who were in her room, including Ronald, to the primary playground for the physical education or play period. There were 33 pupils under her care and supervision at that time. Play equipment on that ground included swings, sand boxes, and a slide. On the larger playground, at a point 88 feet north of the building, there was a tether ball pole which was about 12 feet high. Attached to the top of the pole there was a chain which was about 5 feet long. Attached to the lower end of the chain there was a rope about 4 feet long. Attached to the lower end of the rope there was a tether ball which was about 12 inches in diameter. The tether ball was about 2 feet from the ground. The surface of the playgrounds, including the area around the pole, was asphaltic concrete commonly known as blacktop. Another teacher was supervising about 30 second grade pupils on the larger playground in an area thereon which was between the tether ball pole and the place where Ronald's teacher was supervising first grade pupils. About 10 or 15 minutes after the first grade pupils had been taken to the primary playground, the attention of the second grade teacher was directed to the tether ball pole by "a movement," which she later found was a child falling. She ran to the child who was flat on his back on the pavement near the bottom of the pole. The child was Ronald Reisman. She picked him up and walked with him to his teacher who was on the primary playground. His teacher testified that when he was brought to her he was "whimpering"; she examined him for bruises, took him into the building, bathed his face, and let him rest; she found no bruises or abrasions; the school bus, in which he usually went home, arrived about five minutes after he had been brought to her; she asked him if he felt like going home on the bus; he replied, "Yes"; she let two little boys walk with him to the bus. The bus driver testified that when Ronald entered the bus he was whimpering and holding his head; she took him to his home—a distance of approximately one-half mile; when he left the bus he was still whimpering and holding his head; she saw him enter the front door of his home.

About 7:15 p. m. of that day a physician went to Ronald's home and examined him. At that time he was semiconscious

and could be aroused. When the physician saw him at 9:15 p. m. he seemed to be in a stupor, he could not be aroused as easily, and the pupil of one eye was larger than the pupil of the other eye. Then he was taken to a hospital where another physician examined him. It was found that he had a hemorrhage from the middle meningeal artery (an artery in the temporal region of the skull—on the inner surface of the skull and on the outside covering of the brain). About 5 p. m. of the next day an operation was performed upon his brain, and he died that night. The cause of death was a tear of his middle meningeal artery. A physician testified that the artery is in a little bony channel with edges that are sometimes sharp where it comes through the undersurface of the skull, and that when the head is struck and there is a movement of that bone, the bone might lacerate the artery and start a hemorrhage.

Ronald's teacher also testified that she usually stands near the center of the primary playground during the play period; she could not see the tether ball from that position; she did not know that Ronald had left that playground until the other teacher brought him to her; pupils who were upon that playground could enter the east side of the building, at any time, to go to the lavatory; pupils who were in the building could go upon the larger playground by going through the hallway and out the north exit; while she was on the playground she could not see pupils who were in the building.

A structural engineer, called as a witness by plaintiffs, testified that he tested the hardness of the surface of the asphaltic concrete (blacktop) at quite a few places on the playgrounds at said school, including the area around the tether ball pole; the result of the test was that the surface at those places was of the same hardness; he tested the hardness of surfaces of different kinds of materials at places other than said playgrounds in order to compare or illustrate the hardness of the surface on the playgrounds; one of the places so tested was the rock and oil surface on the Vermont Avenue bridge over the new Hollywood Freeway; the surface of the playgrounds here involved was about one-third harder than the surface on that bridge.

Mr. Lackey, called as a witness by defendants, testified that he is an employee of the Asphalt Institute, an organization which promotes the proper use of asphalt and which checks specifications for the general public for all types of asphalt design and construction; as such employee, during

the past six years, he checked asphalt specifications and designs for the Los Angeles City Board of Education; that, generally speaking, asphalt on highways is considerably harder than asphalt on school playgrounds. A general paving contractor, called as a witness by defendants, testified to the effect that asphalt on highways was harder than asphalt on school playgrounds.

The supervisor of safety for the Los Angeles city schools testified that he did not know of any more suitable material to use under school equipment than the blacktop in use at the schools. Also, the supervisor of physical education for the elementary schools of Los Angeles testified to that same effect.

Mr. Houston, the director of physical and health education for the Los Angeles city schools, testified that he was of the opinion that asphaltic concrete is a proper substance to put under playground equipment where small children play; that a written report, which is referred to as defendants' Exhibit J for identification, was compiled on May 22, 1951, and it is a report covering certain studies made over a period of approximately 20 years, relative to playground safety; the report includes matters which occurred before the accident involved here and matters which occurred thereafter; the report includes, in the fatality listing, the fatality of Ronald Reisman; the report was prepared by the staff of which he (witness) is the head, and the report was made under his direction; the actual compilation was made after this accident occurred and after plaintiffs' claim (for damages) had been filed with the board of education, but certain studies in relation to the report had been carried on prior to the accident—the studies were carried on as a sort of continuous program; he was present at a meeting of the board of education on May 24, 1951, when the superintendent of schools read said report and presented it to the board. The report was filed with the board on said day.

The report, just referred to, was offered in evidence by defendants for the first time upon their second redirect examination of the witness, and then the offer was deferred by defendants until the attorneys could discuss the offer with the judge out of the presence of the jury. Thereafter the defendants, upon their fourth redirect examination, offered the report in evidence. Plaintiffs objected thereto upon the grounds that it was incompetent, irrelevant and immaterial,

not the best or the complete evidence of the matters set forth therein, hearsay, arguments, and containing matter that occurred after the accident involved herein. Thereupon, the judge reserved his ruling upon the objection. (Reporter's transcript p. 836.) Two days later, after 14 other witnesses had testified and just before the parties rested, the judge asked the attorneys if they had anything further to say before he ruled upon the objection to the offer in evidence of "Exhibit J for identification." (Rep.Tr. 1053.) Mr. Shannon, the attorney for plaintiffs at the trial, said: "Now, is it understood, as far as objections are concerned, that I have made all the objections that might properly be made to the introduction of the document?" Mr. Thomas, the attorney for defendants, said: "Well, my recollection is that you did object, Mr. Shannon." Mr. Shannon said: "I did, I was hopeful——" The judge said: "The ones already made will be deemed made to it at this time, all of them, if that is what he has in mind." Mr. Thomas said: "Certainly. The three of us have argued quite at length and off the record. I see no useful purpose to be served by making Mr. Shannon repeat all his objections." Mr. Shannon said: "What I am getting at, as far as the objections made, I have made all the proper objections to the introduction of the document." Mr. Thomas said: "He has—I don't know about the proper objections, because obviously I don't think any of his objections are proper, but I do agree with Mr. Shannon that he has made the objections voluminously on various reasons. I assume the court is going to give a ruling and base his reasons on something that somebody said to him." The objection was then overruled, and Exhibit J for identification (the report) was received in evidence as Exhibit J.

Appellants contend that the court erred prejudicially in receiving the report, Exhibit J, in evidence. They argue that the report, which was compiled on May 22, 1951—more than two years after the accident herein (March 16, 1949), contained many matters which occurred after the date of the accident herein; that it is interwoven with, and is a conglomeration of, conclusions, testimonials, arguments in favor of the defense, charts and statistics; that it is, in many respects, irrelevant, incompetent and immaterial; and that it was probably prepared with an eye to the defense of this lawsuit.

The exhibit consists of : (1). A summary of said report—being a page of typewriting attached to the front of the

report. (2). Another page of typewriting attached to the report which is a table of contents that lists 13 topical headings. (3). The report, consisting of 18 pages—16 pages being in typewriting and 2 pages being charts.

The summary of the report states (in the caption) that the report is "Relative to Playground Surfacing in Los Angeles Elementary Schools." It also states, in part, that: "The opinion of the principals, playground supervisors, and others using the apparatus is in overwhelming support of the blacktop hard-surfacing program now in effect."

· Page 1 of the report is labeled "Introductory Statement," and it states, in part: "This Report has been prepared in response to requests that have been made for accurate information concerning the accident situation in the Los Angeles Elementary Schools during recent years." "However, it is obviously true that the Report supports a case for blacktop hard-surfacing because it is undoubtedly true that there is a substantial basis for the present program and also the present program does reflect the attitude of approximately all of the school principals, the physical education supervisors, superintendents, and members of the Board of Education."

Page 2 of the report contains statistics as to the kinds of surfaces that are under playground apparatus in school systems in 47 large cities of the United States. The statistics show that 27 of those cities have blacktop under the apparatus; 10 have no apparatus; 9 have surfaces other than blacktop, such as dirt, sand, grass or shavings.

Page 3 of the report contains statistics as to the kinds of surfaces that were under playground apparatus, in the spring of 1950, in 29 school systems (involving 73 schools) in the vicinity of Los Angeles, such as San Bernardino, Barstow, and Glendale. The statistics show that 8 systems use only blacktop, that of the 52 schools which have part dirt and part blacktop for the whole playground surface 19 have only blacktop under the apparatus, 18 have blacktop under more than 50 per cent of the apparatus and 15 have blacktop under less than 50 per cent of the apparatus.

Page 4 is a chart purporting to show in terms of percentage the information stated on page 3. It shows, by use of diagrams or bars, that a greater percentage of blacktop is used under the play apparatus (except under horizontal ladders and bars).

Page 5 is labeled "Accident Rate at Elementary Schools

of Los Angeles before and after Installation of Blacktop.''
It is stated thereon that the following page (p. 6) is a chart
showing the number of major accidents on playground ap-
paratus per 100,000 student-days of usage as compared with
blacktop in millions of square feet. It also states that the
blacktop program was begun about 1940-41 and the blacktop
area was expanded extensively through the following years,
and that the rate of apparatus accidents did not increase. It
also states that the chart indicates that in 1931-32 (when
there was no blacktop) there were about 1.4 apparatus acci-
dents per 100,000 student-days, and in 1948-49 (when about
60 per cent of the elementary playgrounds were surfaced with
blacktop) the rate was 1.3.

Page 6 is a graph chart which is referred to on page 5.

Page 7 shows a comparison of the number of accidents in
connection with playground apparatus in Los Angeles ele-
mentary schools during the period from 1931-32 to 1948-
49. It is stated that there was a reduction in the accident
rate from 1931-32, when sand or shavings were under all
apparatus, to 1948-49, when blacktop was under 60 per cent
of the apparatus. It is also stated that in 1931-32, when there
were 1,885 pieces of apparatus and an average daily attend-
ance of 162,474, there were 305 apparatus accidents; and that
in 1948-49, when there were 2,976 pieces of apparatus and
an average daily attendance of 190,185, there were 361 acci-
dents. After seting forth other figures showing certain com-
parisons, it is stated that the decline in the rate represents
''a *36% decrease*'' in the rate in 1948-49 as compared with
1931-32. It is also stated therein that a table, upon which
said comparisons were based, is on the following page (p. 8).

Page 8 is the table referred to on page 7. It shows the
comparison of accident rates in each school year from 1931-
32 to and including 1948-49.

Page 9 is a report on the number of fatalities in the Los
Angeles elementary schools during the past 21 years (pre-
ceding May 22, 1951). It is stated that on the following
page (p. 10) there is a detailed report of the fatalities ''re-
ported as possibly originating'' during the past 21 years.
It is also stated that during the 21 years there have been
11 fatalities, and the two most recent ones seem to have been
related to the blacktop under playground apparatus; and
that, although there was an increasing amount of blacktop
under the apparatus from 1940 to 1948, there was no fatality
during that period that was connected with the blacktop.

It was also stated that "it must be realized that sometimes these tragic accidents will occur no matter how many precautions are taken to prevent them," and that "it must be remembered that during the past *21 years* there has been . . . a total of 777 million pupil-school-days of playground use," and that "it should be remembered that there have been only *11 fatalities* in our elementary schools during 777 million pupil-school-days in our playgrounds during this period of *21 years.*"

Page 10 is the detailed report of the 11 fatalities referred to on page 9. As to each one it lists the year of the accident, the name of the school, age of the child, and cause of death. Opposite each listing there is a statement of "Related Circumstances." The listing of the 10th fatality was as follows: "1948-49 Wilshire Crest 6 [age of child] AC [asphaltic cement under apparatus] Fall Tether Ball Concussion Fell from tether ball suspended from pole. Child was out of authorized play area, using incorrectly equipment reserved for older children." The 11th listing shows that in 1950-51 a 6-year-old child fell from a swing onto blacktop at the Vine Street School.

Page 11 is entitled "Severity of Accidents," and it is there stated that the severity of all accidents in elementary schools in Los Angeles for 1949-50 was 1.8 days lost per major accident as against the national elementary school rate of 2.9 days lost per major accident for the same year; it is interesting to note that our accident-severity-rate is less serious than the national average; the 11 fatalities that have occurred during the last 21 years contrast with the two to three hundred deaths of elementary-school-age children which have occurred during the same period as the result of *accidents in home areas.*

Page 12 is entitled "Statements by Experienced Los Angeles Elementary School Principals on Playground Surfacing." It is there stated that all evidence that has been received indicates that those principals "are overwhelmingly in favor" of blacktop under playground apparatus. It is also stated that "The following excerpts from statements made by Elementary School Principals are interesting and significant in consideration of this problem of playground surfacing." Those excerpts, 23 in number, are on pages 12, 13, 14 and 15 of the report. The excerpts are to the effect that blacktop is safer, more satisfactory, and more desirable than other kinds of playground surfacing. In 10 of the excerpts it is stated that there has

been no increase in accidents since blacktop has been used. (In the other excerpts, there is no statement as to whether there has been an increase or decrease in accidents.)

Page 16 is entitled ''Concluding Statement.'' (The statement is on pages 16, 17 and 18.) It is there stated that in 1936 the grand jury presented to representatives of the board of education ''the matter of dust on the school playgrounds,'' and that the foreman of the jury felt that the board should study the situation looking toward some way of reducing the dust hazard. It was also stated that the change from dirt, sand and mud to blacktop came ''in response to widespread community and school demand'' and was ''approved by parents, teachers, principals, and other school administrators''; that ''The assumption must not be made that the present situation involving blacktop hard-surfacing on most of the playgrounds has resulted in an adverse change in the playground accident situation. The opposite is true, since there has actually been a reduction in the accident-rate over the periods before and after blacktop surfacing, as indicated elsewhere in this report.'' It is also stated that teachers and supervisors and principals have found that blacktop ''actually promotes safety,'' and the ''facts that have been given in this report bear out their experience.'' It is also stated: ''It would be natural for a layman, who has not had extensive experience with actual playground conditions, to look at blacktop hard-surfacing and immediately draw the conclusion that it must be more dangerous because it is hard. But a more careful analysis of the situation necessitates a consideration of all the conditions that enter into the problem and leads to the conclusion that the answer involves much more than simply contrasting the hardness of surfaces.'' It is stated further: ''We want to keep the number and severity of accidents at the very lowest minimum humanly possible. But common sense indicates that, in spite of all possible precautions that can be taken and are being taken, accidents will occur.''

Respondents argue that the court did not err in receiving the report (Exhibit J) in evidence; that the exhibit is a public report and it was made in the course of business and is admissible under the Uniform Business Records as Evidence Act (Code Civ. Proc., § 1953f); that appellants' objections at the trial to the offer of the report did not include objections now asserted on appeal, namely, (1) that no foundation was laid for the introduction of the report, in that, there was no showing that conditions on other school grounds, referred

to in the report, were similar to the conditions on the grounds herein, and (2) that a sufficient foundation was not laid for the introduction of the report under the Uniform Business Records as Evidence Act; that where a part of a single report is admissible an objection to the whole report is properly over-ruled.

Section 1953f of the Code of Civil Procedure (which is part of the Uniform Business Records as Evidence Act) provides: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." In *Loper* v. *Morrison*, 23 Cal.2d 600 [145 P.2d 1], the court, in referring to said section, said at page 608: "The purpose of this act is to enlarge the operation of the business records exception to the hearsay evidence rule. The common law exception is based on the assumption that records kept in the general course of business usually are accurate, and may be used, in case of necessity, as evidence of the matter recorded. . . . But the exception has been hedged about with so many burdensome restrictions that legislation has been necessary to secure wide-spread use of such records." ▮ The report herein (Exhibit J) was not made, as provided in said section 1953f, "at or near the time of the act, condition or event" involved here—it was made about two years and two months after the accident. Also, it is to be noted that it was made (by defendants) about one year and two months after this action for damages was commenced against them. The report was not made in the regular course of business in the sense that the words "regular course of business" are used in said section. In *Palmer* v. *Hoffman*, 318 U.S. 109 [63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719], which was an action for damages arising from a collision of an automobile and a railroad train, the engineer made a statement at an office of the railroad company where he was interviewed by an assistant superintendent of the company and by a representative of the public utilities commission. The engineer died before the trial, and the company offered his statement in evidence under an Act of Congress (49 Stats. 1561, ch. 640, 28 U.S.C.A., § 695) which was in substance the same as our said section 1953f of the Code

of Civil Procedure. The Supreme Court held that the statement was not admissible, and said: "It [statement] is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act. . . . Any business by installing a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify those reports under the Act. The result would be that the Act would cover any system of recording events or occurrences provided it was 'regular' and though it had little or nothing to do with the management or operation of the business as such. Preparation of cases for trial by virtue of being a 'business' or incidental thereto would obtain the benefits of this liberalized version of the early shop book rule. The probability of trustworthiness of records because they were routine reflections of the day by day operations of a business would be forgotten as the basis of the rule. [Citation.] Regularity of preparation would become the test rather than the character of the records and their earmarks of reliability [Citation] acquired from their source and origin and the nature of their compilation. . . . If the Act is to be extended to apply not only to a 'regular course' of a business but also to any 'regular course' of conduct which may have some relationship to business, Congress not this Court must extend it. Such a major change which opens wide the door to avoidance of cross-examination should not be left to implication. . . . The several hundred years of history behind the Act [Wigmore, *supra*, §§ 1517-1520] indicate the nature of the reforms which it was designed to effect. It should of course be liberally interpreted so as to do away with the anachronistic rules which gave rise to its need and at which it was aimed. But 'regular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business.''

In the present case, where the evidence as to how the acci-

dent happened was meager, the report included, under the heading "Related Circumstances" on page 10, a statement that the child (Ronald) was "using incorrectly equipment reserved for older children." The report, in addition to stating how the accident happened, included (1) purported information regarding playground surfaces at various other schools in Southern California and other parts of the United States; (2) statements to the effect that after the use of blacktop was begun at the elementary schools of Los Angeles the accident rate did not increase, but, under certain stated comparisons, the rate decreased; (3) statements that the accident-severity-rate in the elementary schools in Los Angeles is less serious than the national average, and that during the past 21 years there were more deaths of elementary-school-age children in home areas than there were at schools; (4) statements of several school principals to the effect that blacktop is safer than other kinds of surfacing; (5) statements to the effect that blacktop is used in response to community and school demand, and that teachers have found that blacktop actually promotes safety, and that in spite of all possible precautions accidents will occur; and (6) statements regarding conditions of playgrounds and the severity of accidents after the accident herein. (Such last mentioned statements relate to matters occurring in 1949, 1950, and 1951.)

It does not appear that the purported information in the report was information which the board of education recorded according to a systematic or routine method of recording acts, conditions or events for the purpose of reflecting transactions with others or providing information for use in administering other affairs of the schools. The report indicates that it was made in justification of the use of blacktop on elementary school playgrounds. It states on page 1 that it was made in response to requests for accurate information concerning accidents during recent years; that it supports a case for blacktop hard-surfacing because there is a substantial basis for the program (blacktop) and the program reflects the attitude of approximately all the principals, superintendents, and members of the board; that it is hoped that the report will be helpful to the committee which would be appointed to study the matter of surfacing (referring to the committee of thirty citizens, the appointment of which was authorized by the board two days before the report was presented to the board) ; that the problem of surfacing is one on which there

can be differences of opinion, otherwise the problem would not be receiving the attention it is now receiving. The report contains many opinions, arguments, and statements of purported facts which were highly prejudicial to plaintiff. The statements therein of the individual opinions of various principals to the effect that blacktop was more safe and satisfactory than other kinds of surfacing would not have been admissible if such opinions had been offered by way of oral testimony. Also, the statements therein to the effect that experienced principals are overwhelmingly in favor of blacktop, that blacktop was approved by parents, teachers, and school administrators, and that the change to blacktop came in response to widespread community demand, would not have been admissible as oral testimony. In *McGowan* v. *City of Los Angeles,* 100 Cal. App.2d 386 [223 P.2d 862, 21 A.L.R.2d 1206], the court, in referring to section 1953f, said at page 392: ''The statute does not change the rules of competency or relevancy with respect to recorded facts. It does not make that proof which is not proof. It merely provides a method of proof of an *admissible* 'act, condition or event.' It does not make the record admissible when oral testimony of the same facts would be inadmissible.'' It was error to receive the report in evidence under the provisions of said section 1953f.

Respondents argue further that the report was admissible under sections 1920 and 1926 of the Code of Civil Procedure. Section 1920 provides: ''Entries in public or other official books or records, made in the performance of his duty by a public officer . . . are prima facie evidence of the facts stated therein.'' Section 1926 provides: ''An entry made by an officer, or board of officers . . . in the course of official duty, is prima facie evidence of the facts stated in such entry.'' As above shown, the report herein contained numerous opinions, arguments, and statements of purported facts which would not have been admissible as oral testimony. There was no official duty on the part of the board to make entries of such a report in official books or records. The statements in the McGowan case, above quoted, are applicable here. It was error to receive the report in evidence under said sections 1920 or 1926.

Respondents also argue that the report was properly received in evidence because Mr. Shannon, the attorney for appellants at the trial, was the first one to use a portion of the report. Appellants reply that said portion was used first by Mr. Thomas, the attorney for respondents. Mr. Houston, on direct examination by Mr. Thomas, was asked when blacktop

was first used on the Los Angeles school grounds. He replied that to the best of his recollection it was around 1933. Appellants assert that apparently at that time Mr. Houston used page 6 of the report (the graph chart) to refresh his recollection. When Mr. Shannon was cross-examining that witness, he asked him if the asphalt program began about 1933. He replied that it was around that time. Then Mr. Shannon asked if they started about 1938 with a rapid and thorough program. He replied that it was a little slow then, and that about 1947 the big increase occurred. Mr. Shannon then asked: "You say a very small program in 1938. Will you use this sketch I hand you for the purpose of refreshing your memory, if it does refresh your memory, and tell me from the year beginning with 1938, 1939, 1940 to 1941 and 1942 how many tons of asphalt concrete you laid on the school grounds? Thereafter Mr. Thomas offered the chart in evidence. Mr. Shannon said: "I have permitted him to use it as a memorandum and I have no objection to it going into evidence." The judge said: "The only one who can offer it is you." Mr. Thomas said: "Yes, sir. A burned child fears fire, so I am offering it into evidence right now." The judge said: "That is agreeable. He used it to refresh his recollection. *You are the one who used it on direct examination.* There is no objection to offering it now?" (Italics added.) Mr. Shannon said: "No objection." ■ In view of the statement of the judge to the effect that the witness used said page 6 on *direct* examination, it appears that said exhibit was not used first by appellants. Appellants did not waive objections to the report (Exhibit J) by their references on cross-examination to said page 6.

■ Respondents argue further, as above stated, to the effect that appellants did not object to the report on the ground that there was no foundation for its introduction in evidence and therefore they should not be permitted on appeal to contend that there was no showing by respondents that conditions on other school grounds, referred to in the report, were similar to the conditions on the grounds herein. When the report was offered in evidence appellants objected on various grounds as hereinabove set forth. Also, as above shown, the ruling on the objection was not made until two days later—after several other witnesses had testified. It is apparent, from the proceedings had just preceding the ruling, that Mr. Shannon was endeavoring to conserve the time of all concerned by avoiding a restatement of his objec-

tions, but, at the same time, he was insistent upon its being understood that he had "made all the objections that might properly be made to the introduction of the document." Under the circumstances, it should be concluded that appellants' objections were sufficient as a basis for their contentions on appeal.

Respondents also argue, as above stated, that where part of a single report is admissible an objection to the whole report is properly overruled. The report is interwoven with hearsay, many opinions, testimonials and arguments in favor of the respondents. The trial judge, in ruling upon the objections to the report, said: "Then, also, as to the opinions therein concluded, I looked through to see if I could cut out the opinions and conclusions and better make the record reflect as to what its relevancy appears. As to the opinions and conclusions of the Superintendent as to the use of blacktop at the time and place, to wit, in 1951, there has been a serious consideration." He also said: "As to the record, itself, I would have liked to have segregated it and made its objectionable features less pointed up without materially affecting its usefulness and its relevancy. I can't do that because it is so interwoven with opinions." It does not appear what part, if any, of the report was made under such circumstances that it would be admissible as an exception to the hearsay rule—it does not appear what part, if any, was made in the regular course of business, at or near the time of the act, condition or event referred to; and it does not appear what part, if any, was entered in an official book in the course of official duty.

It was prejudicial error to receive the report (Exhibit J) in evidence.

Respondents argue further that a special interrogatory, regarding contributory negligence, and the jury's affirmative answer thereto sustain the judgment herein, irrespective of the question as to the admissibility of the report. A special interrogatory was as follows: "At the time of the accident in question, was Ronald Marc Reisman guilty of contributory negligence?" The jury's answer thereto was "Yes." It is to be assumed that Exhibit J, which was erroneously received in evidence, was considered by the jury in arriving at its answer to the interrogatory. That exhibit contained statements indicating that the child was negligent. Such statements were as follows: The child was "using in-

correctly equipment reserved for older children"; "[I]t must be realized that sometimes these tragic accidents will occur no matter how many precautions are taken to prevent them"; "[C]ommon sense indicates that, in spite of all possible precautions that can be taken and are being taken, accidents will occur." It cannot be concluded that the answer to the interrogatory would have been the same if said report had not been received in evidence. The judgment is not sustained by said interrogatory and answer.

By reason of the above conclusions it is not necessary to consider other contentions.

The judgment is reversed. The purported appeal from the order denying motion for new trial is dismissed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied March 16, 1954, and respondents' petition for a hearing by the Supreme Court was denied April 21, 1954.