[Crim. No. 3624. Third Dist. June 10, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID
BAZAURE, Defendant and Appellant.

Scott & Balocco and Robert Gordon Scott for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Raymond M. Momboisse and Richard K. Turner, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—On June 26, 1963, at approximately 6:40 p.m., at Deuel Vocational Institution, two inmates with knives stabbed an officer. The officer was Connie Wendell Prock, 23 years of age, a novice-guard at the institution. He died that night of the wounds inflicted. Within 20 seconds after the attack he described defendant David Bazaure as an assailant. Suspicion was also cast upon codefendant Doreteo C. Betancourt almost immediately through the discovery by investigating officers of poorly hidden bloodstained trousers which Betancourt admitted were his. That same night the two defendants were placed in separate cells in an isolation unit. They conversed freely between themselves and with other Mexican inmates of the unit. · They talked loudly (so their voices would carry from cell to cell). Spanish-speaking officers, assigned in relays to listen, overheard the conversations which continued sporadically most of the night and the next day. The statements of both defendants, related on the witness stand by these officers, demonstrate unequivocally that both had participated in the murder. From time to time one or the other of the two defendants was removed from the unit for questioning by investigating officers. Part of the overheard conversations between the two related to the story each had told or would thereafter tell when called for further questioning.

The two defendants, interrogated separately, gave statements to the investigating officers both before and after their conversations in the isolation unit. Those statements were received in evidence at the trial.

Also, at the trial seven inmates, eyewitnesses to the stabbing, testified for the People. All of them identified Betancourt as an assailant. One, Lacey, identified Bazaure as standing with a knife near the victim. This witness also saw Bazaure depart into a shower room.

The jury convicted both defendants of second degree murder. Only Bazaure has appealed.

Defendant's numerous assignments of error will be considered at length below. With one exception we disallow them. One contention—that extrajudicial statements by the defendant were improperly admitted in evidence under the rules of *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]—must be sustained.

Unlike the statements considered in *Dorado* and *Escobedo,* those in the case at bench were neither confessions nor

incriminating statements. On the contrary, they were, if believed, exculpatory. In the recent case of *People* v. *Hillery,* 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382], filed May 3, 1965, our Supreme Court held that the *Dorado* rule applies to the prosecution's offer of exculpatory statements obtained under the conditions proscribed as well as to confessions and incriminating statements. Therefore admission of defendant's statements was error. But *Hillery* also holds (on p. 712) that the admission of exculpatory statements is not prejudicial per se and that an examination of the record must be made to determine whether under article VI, section 4½ of the California Constitution actual prejudice has occurred. We are convinced that under the facts of this case no prejudice has resulted. Explanation of our reasons will require a detailed treatment of the evidence in the record.

Unit D at Deuel (in which the murder was committed) is a three-tiered unit of a compound of cell blocks; each tier therein having a row of cells running along the east and west sides of the building fronting inward onto 4-foot-wide catwalks. These catwalks are separated by an open area from the first floor to the roof. The distance across this area between the outer rails of the east and west catwalks is approximately 10 feet. A catwalk also runs along the north wall of the third tier, connecting the east and west catwalks. In the northwest corner of the building a stairway with a landing midway between each tier runs from the third tier to the first. This leads to the entrance door of the unit (kept locked) located in the center of the north wall (first tier).

The attack occurred at a point along the catwalk in the northeast portion of the third tier. We describe the rooms of this area on the east side running from north to south: The most northerly is a locked storeroom. Adjoining the storeroom is a tiled shower room, the north portion of which is a dressing area, separated from the showers (with four shower heads) by a low tiled step-over partition. An open entrance 42½ inches wide gives access to the shower dressing room from the catwalk. The length of the catwalk from the north end of the shower entrance to the north wall of the building is 8 feet 6 inches. To the south of the shower room is the east side stairway similar to that on the west side described above. The distance separating the south end of the shower entrance and the north end of the stairway entrance is 8 feet. Built into the wall approximately midway between the shower entrance and the east side stairway is a lock control called a

lock-box or bar-box, by which the cells of the third tier east are opened and locked as described below.

From the blood on the floor of the catwalk and the description of the attack given by the witnesses, the stabbing occurred on the catwalk of the third tier east at a point near the shower entrance.

At approximately 6:30 p.m., June 26, 1963, the victim, Connie Prock, entered the D Unit north entrance to supervise a shower call. Each boy in the unit had previously been locked in his cell. The practice is to release the boys wishing to take showers one tier at a time. Each side of each tier has a separate lock-box. By manipulating its mechanism all cells on the side of the tier served can be unlocked simultaneously. The guard calls out, e.g., "shower call west side first tier," etc. and unlocks all the cell doors of that side and tier. They remain so only for a brief interval during which an inmate wishing to shower steps out, carrying his towel and change of clothing, if any, and proceeds to the showers. The cell doors are then relocked. Thus those intending to take showers are locked out; the others are locked in. There are showers on the east side of each tier (excepting the first, where it is on the west side) and the boys are permitted to select any of the three regardless of the tier in which their cell is located.

On the day in question, June 26th, Prock opened the lock-boxes progressively from west side to the east side, starting from the first tier upward. Altogether 35 inmates answered the shower call and were locked out. When he reached the third tier he opened the west cells first. Bazaure occupied cell 302, Betancourt, 304 (both on the west side). Both were among those who answered the shower call. Both passed Prock on their way to the east side shower on the third tier. They joined other inmates at, near or in the shower room. Prock, having locked the west side cells, proceeded to the east side lock-box. Before the stabbing he had unlocked the east side third-tier cell doors and had locked them again.

None of the eyewitnesses described the commencement of the attack. Inmate Michael Lacey's testimony seems to cover its earliest phase. He was standing on the third-tier catwalk at the top of the third-tier stairs when he heard a thump "like someone falling." He looked and saw Betancourt kneeling over the prostrate officer, stabbing him with a knife. Bazaure was standing beside the victim about a foot away. He also had a knife in his hand. The distance separating Lacey from the affray was 6 to 12 feet. Lacey heard Officer Prock scream.

Betancourt stabbed Prock a "half a dozen" times. Lacey did not see Bazaure stab the victim. While Betancourt was stabbing Prock and the officer was struggling to get away, Bazaure went into the shower room. Lacey, moving his position, saw Bazaure go to the open window of the shower room. The witness said: "I seen him stick his hand out the window like he was dropping something." (There is a ledge along the window.) Lacey then observed Prock break away from Betancourt and run along the north catwalk and down the west side stairs—still screaming. Betancourt followed a short way and then threw his knife at Prock as the latter ran down the stairs. This knife was later found on the stair landing of the second tier.

Since Betancourt's bloodstained trousers were found soon thereafter stuffed under his locked cell door, it is inferable that Betancourt, before returning to the east side shower to join Bazaure and the other boys there, had removed his trousers, seeking to dispose of them.

There is no point in summarizing in detail the accounts given by the six other inmate eyewitnesses. Their testimony, although differing in detail, is not substantially inconsistent with Lacey's. Bazaure's counsel, pointing out that none of the other witnesses saw Bazaure present or participating in the stabbing, argues this as proof that Lacey was lying. However, the attention of all witnesses was directed to the murderous assault by Prock's screams, by which time, according to Lacey, Bazaure had left the catwalk and had gone into the shower room. Also the point at which the other witnesses fixed Betancourt and the victim when they first saw them was near the northeast corner where counsel argues that other witnesses must have arrived before Lacey, because they described seeing Prock while he was "falling." But, as these witnesses described it, Betancourt and the victim were then at or near the northeast corner of the catwalk by a ladder. That is not where the attack began as the bloodstains clearly established. If these witnesses actually saw Prock falling near the corner, then he must have struggled to his feet and fallen again after the first attack.

Also argued is that all of the witnesses had originally denied having seen the stabbing and only gave statements after assurances they would be given protective custody. This fact can be urged as impeachment, of course. But it is equally arguable that fear of reprisals from fellow inmates was a cogent reason for the original denials.

Another who heard Officer Prock's screams was Sergeant Robert Scott. This was at approximately 6:40 p.m. He was in J Unit across the corridor from D Unit. He went to D Unit and let himself in with his key. As he walked down the corridor of the first tier, he heard someone call out "trucha," a word in Spanish used by inmates to indicate that an officer is coming. As he looked up toward the north end of the third tier he heard and saw Prock and observed the latter's flight, described above, down the stairs and out the entrance door. As Prock ran by, Scott called out, asking, "Who did it?" Prock answered, saying either: "the fat one" or "the fat boy." The statement was repeated twice. Scott ran to help Prock who collapsed about 5 or 6 feet beyond the door. Prock attempted to talk further, but his mouth was full of blood and his speech was unintelligible. In a matter of five seconds he became unconscious. Apparently he. did not recover consciousness again before he died.

Prock's death occurred at 7:09 p.m. The pathologist who performed an autopsy noted 12 stab wounds, seven in the posterior portion of the body, including one in the neck, and five in the anterior portion, including one in the face; one had penetrated the heart. Measurement of the wounds showed that some could have been produced by the knife said to have been thrown by Betancourt and which was found on the second tier stair landing. (It is before us—a crudely fashioned sheath of steel $8\frac{1}{4}$ inches long, 1 inch wide at one end, tapering to a point at the other end, with the tapered portion knife-edged.) The other knife (to be discussed below) was also exhibited to the doctor. He testified that it could have produced certain of the wounds.

A state criminologist who had examined and measured the cuts in Officer Prock's shirt and T shirt, and who had examined the two knives, testified that the shirt perforations corresponding to the wounds in the area of the neck were more consistently related to the use of the small knife, those in the back area, to use of the larger.

Officers Parrish and Blodgett were apparently the first officers to be sent to the third tier. They arrived within a matter of a few minutes after the stabbing incident. Officer Parrish saw both of the defendants and both at that time were nude and under the showers. Blodgett also saw them. One other inmate, Abilez, was also in the shower room. Other inmates, not identified, were in the vicinity.

Thereafter Sergeant Duke went to the third tier to collect

identification cards from all the inmates locked out of their cells. (All locked-out inmates had previously been directed to stand by their cells preliminary to a systematic search of their persons.) When Duke approached Bazaure, the latter was standing on the west side catwalk by cell 301. It is the cell nearest the west stairway. The officer told Bazaure to stand against the wall, then commenced to search him. While he was conducting this search, he noticed a knife lying on the stairway landing between the third and second tiers.

This knife also in evidence had been made from an oil dipstick (such as that used in an automobile engine). None of the several officers who had climbed the stairs to the third tier previously had seen the knife. Lacey had testified that the knife he had seen Bazaure holding was made from such a dipstick (although he was not asked to identify the knife in evidence). Two bloodstained towels were found by the officers, one in the shower room, one hanging on the iron rail of the catwalk immediately in front of Bazaure's cell. It was the prosecution's hypothesis that this knife, possibly hidden by Bazaure on the shower room window ledge after the stabbing, had been retrieved by him when he had completed his shower, then wiped off with a towel to obliterate fingerprints and later thrown down the stairway because Bazaure was returned to stand by his cell preparatory to submission to search.

Questioning of Bazaure and Betancourt was conducted during the early evening. Regarding the questioning of Bazaure, Captain Stephens testified: ''He was questioned regarding the attack on Mr. Prock and he denied it all the way.''

At approximately 9:30 that night Bazaure was moved to K Unit which is an isolation unit. Three Spanish-speaking officers, Quintana, Palacioz and Gomez, at different times and in relays, overheard conversations during the night, the next day, and perhaps on a second day, between Bazaure and others, including Betancourt and Abilez. As stated at the outset of this opinion, Bazaure commenced talking (in Spanish) to another inmate almost immediately after being placed in K Unit. His first conversation was with one Sabedra who asked him what had happened. Bazaure's statements included the following: ''They got the other guy with blood on his clothes. If we both don't say anything, they can't get us both. . . . I wasn't in the shower when it happened. I told them I was, but I wasn't. I hope everything goes all right and they cut me loose. . . . . It's going to be harder for him to beat it because they found blood on his clothes.''

Betancourt was brought in about 12:30 a.m. and placed in another cell. Bazaure asked Betancourt what questions had been asked him. The latter replied: "The pants with blood were mine and they thought they were yours, but they were mine." Bazaure then said: "They haven't anything but suspicion, we'll beat it." Betancourt said: "I told them the officer, I mean the bull, ran by me and pushed me, that's how I got blood on my clothes. I told them you were in the shower."

Later Bazaure stated: "I think he died before he could talk, because he knew my name."

During the night and part of the next day each defendant was questioned several times. Questioning took place in the interrogation room. Upon the conclusion of each session the defendant questioned was returned to a cell in the isolation unit. Preliminary to removal, in conversations between the two, each would advise the other what he would tell during the next session of questioning. Upon return each would tell the other what had transpired. The following portions of the conversations as related by the listening officers are typical and illustrative, not all-inclusive: Bazaure: "Did they ask about me?" Betancourt: "Yes. I told them you were in the shower already and I then took one." Bazaure then stated: "I told them I was just getting ready to go into the shower when you got there. . . . That don't make no difference, if you said I was in the water. All they got on us is the blood on you and the 'bull' saying I done it. We'll win. Just hang tight." Betancourt replied. "Yeah, but they got a bunch of dudes down there, and they're going to give them a lie detector test." During one discussion they discussed and decided upon whom they would say had been "there."

Later during the night Abilez was brought into K Unit. The conversation then became three way. Abilez asked: "Who saw us?" Betancourt replied: "I think that guy Angel." (Angel Salcido was a prosecution witness at the trial.) One time during the night, Betancourt, referring to an interrogating officer, said: "[T]hat . . . Palacioz knows the whole story. . . ." Once after Bazaure had been removed for questioning and returned to his cell, he said in reply to Betancourt's question, "What happened?" "They're going to make me as an accomplice, it's all over, Sleepy [Betancourt's nickname], the men from the Sheriff's Office say that they know I didn't use the knife and that only you used it, someone fingered us." Later Bazaure stated: "It was one white guy that saw me

. . . they told me. . . . Hey, Sleepy, we know you didn't use the knife. . . . You know what we'll get us some witnesses who will say that you weren't there, that they didn't see anything.''

Later in the evening after a session of questioning Bazaure said: ''Every little thing they get is bad. Yes, he died. Did you see the photograph? They showed me the photograph. He was on his back, *we gave him four stabbings in the back, some in the front, and one in the mouth.* . . . Twelve times, he had twelve stab wounds. . . . We have to get some witnesses.'' (Italics added.)

The foregoing are samplings taken from many pages of the transcript. There was much repetition, particularly concerning Betancourt's story that he had gotten blood on his trousers when Prock brushed past him and Bazaure's corroboration of that story; also where each had said and would say that both had been in the shower when the stabbing took place. Bazaure suggested at one point that Betancourt should tell the officers there were ''three Negroes, one white, and three Mexicans'' at or in the showers. There was also repetitious lamentation over the fact that the original statements of the two boys when questioned had disagreed as to who was the first under the showers. They were worried about ''the Chief [Abilez] copping out.'' The last statement reported was by Bazaure: ''They can't prove anything if we don't cop out, we just have to stick to our stories.''

As stated above both Betancourt and Bazaure were interrogated by, and gave statements to, several officers and a deputy district attorney. The first statement by Bazaure was given early in the evening of the 26th. Regarding this statement it was only reported that Bazaure denied any participation in, or knowledge of, the crime. A second statement was given at approximately 4:30 a.m. on June 27th. The deputy district attorney and an institution officer also interrogated Bazaure on June 28th. In these statements Bazaure placed himself in the shower room at the time he had heard Prock scream. Concerning Betancourt's movements Bazaure first stated the two had gone into the shower together, later stated that Betancourt had followed him into the shower while he, Bazaure, had been undressing. This account was inconsistent with a statement that when he had heard Prock scream he had gone to the shower entrance, had seen Prock both crawling and running, had seen Prock ''bump somebody'' and identified that ''somebody'' as Betancourt. (''I think I seen him.'')

In the interrogations, as a result of which Bazaure's statements were made, no warning by the officers or by the deputy district attorney was given that Bazaure had a right to remain silent or to be represented by an attorney. Although Bazaure made statements indicating that he may have been aware of his right to an attorney, there was no express waiver of the right. In the transcribed statement given June 28th Bazaure stated he had given it freely and voluntarily, without threats or promises.

During all of the interrogation Bazaure was, of course, in custody, he was a prime suspect (having been already accused by the victim) and the statements were given during a process of interrogation calculated to elicit a confession. Since defendant was not informed of his right to remain silent and to be represented by an attorney and did not waive those rights, admission of the statements into evidence was error (*People* v. *Dorado, supra*) even though the statements given were exculpatory and even though no objection to their admission was made at the trial (*People* v. *Hillery, supra*).

We turn now to the question as to whether admission of the statements was prejudicial. The discussion below which leads us to the conclusion that they were not will also dispose of defendant's contention that substantial evidence does not support the judgment.

Not only was defendant Bazaure accused by an eyewitness, Lacey, and by the victim, he also effectually acknowledged participation in the stabbing in his conversations overheard by three different officers. In addition, strong circumstantial evidence indicated his guilt, *viz*, discovery of the knife used at a point where Bazaure easily could have thrown it, the bloodstained towel found on the rail of the catwalk in front of defendant's cell. Moreover, a motive was shown. There was evidence of bad feeling between Bazaure and Officer Prock, engendered when the latter had given Bazaure a "write-up" (i.e., a report of rule violation) the previous day.

Altogether, the evidence was more than just substantial. With the overheard self-accusatory statements it was overwhelming.

In the light of the entire record we do not find that the improperly admitted extrajudicial statements occupied any significant part in the conviction. In the first place they were not even indirectly incriminating. Whatever inconsistencies exist were only in Bazaure's apparent attempts to

exculpate Betancourt. Moreover, Bazaure testified at the trial and in his testimony repeated without substantial variation the same story he had given in his statements. In *People* v. *Hillery, supra,* the court, after considering (1) the fact that the statements there made were exculpatory, (2) that the testimony of the defendant at the trial was "virtually identical" with the extrajudicial statement, and (3) other overwhelming evidence of guilt concludes (on p. 713, 62 Cal.2d) : "Since there is no reasonable probability that the jury would have reached a result more favorable to defendant if the statements had been excluded, we conclude that the judgment as to guilt must be affirmed (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)'' We reach the same conclusion on the issues under consideration.

And, as stated above, we have found no other contention of defendant sustainable :

 It is urged that the overheard conversations between Bazaure, Betancourt and others while in K Unit were obtained by trickery and are therefore inadmissible under the rule of *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246] (where a planted radio transmitter was used) and in *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380] (*People* v. *Lopez,* 60 Cal.2d 223 [32 Cal.Rptr. 424, 384 P.2d 16]) (where a stool pigeon was placed in defendant's cell). There is no similarity between those cases and the facts here. Neither Bazaure nor any of the other parties to the conversations were induced to talk. Possibly feeling a false security because they spoke in a foreign tongue, the two defendants talked freely and attempted to concoct a story. No element of trickery by the officers was involved. Defendants sought to trick the officers. There was no stimulus from without, only stimulus from within. The officers did not set out to outwit defendants. Defendants outsmarted themselves. When the officers listened to the conversations no right of privacy was invaded. Defendants' right of privacy had been lost when they became Deuel inmates. (*People* v. *Lopez, supra,* p. 248.)

Defense counsel has pointed out a number of time discrepancies regarding the movements of the "eavesdropping" officers. These were found by comparing the officers' testimony as given from their recollection and notes with the records of the institution showing such movements. (The latter were in evidence as People's exhibits.) It is argued that the records had been changed. There is no proof of this. There are dis-

crepancies which were explained and which we do not regard as substantial.

■ Defendant assigns as prejudicial error the failure of the prosecuting attorney to comply with the trial court's discovery order. His principal concern is that there was delay in delivery of a copy of a statement made by the prosecution witness, Michael Lacey. Counsel for both defendants had requested, *inter alia,* the statements of all 35 unlocked inmates who might have had knowledge of the murder. Court orders directing their production had been made on October 23, 1963, and on November 13th. Prior to those orders copies of a large number of statements had been given voluntarily by the prosecution. Lacey had made two statements, one on June 28th, the other on July 23d. The latter had been furnished voluntarily before the court orders were made. Through what appears to have been inadvertence, delivery of the earlier statement had been omitted. It was furnished on the first or second day of the trial which commenced on November 19th. Lacey did not testify until December 3d. There could have been no prejudice to defendant, since defense counsel had the statement well in advance of Lacey's appearance on the witness stand.

■ In the cross-examination of Lacey on Tuesday, December 3d, defense counsel unhappily brought out that Lacey had taken a lie detector test the previous Friday. Defendant now complains he was not furnished with a copy of the questions and answers of this test. He argues that the court order of November 13th was a continuing one and required its production. It was not so worded. The prosecution is not under an absolute continuing duty without request or court order to furnish subsequently acquired documents (*People* v. *Briggs,* 58 Cal.2d 385 [24 Cal.Rptr. 417, 374 P.2d 257]) in the absence of a showing of bad faith (*People* v. *Seach,* 215 Cal. App.2d 779, 785 [30 Cal.Rptr. 499]). There was no showing of bad faith here, under the circumstances described above.

Certain instructions given by the court on the law of conspiracy were urged as grounds for a new trial and are here assigned as prejudicial error. ■ These instructions included the following: The trial court correctly defined conspiracy as ''an agreement between two or more persons to commit a crime followed by an overt act committed by one of the parties to effect the object of the agreement.'' ■ The court properly distinguished conspiracy from ''aiding and abetting,'' pointing out that the former required an express

or tacit preconceived agreement which agreement, however, need not be formal and may be proved by circumstantial evidence. The court further instructed on the consequences of proof of a conspiracy.

██ A criminal conspiracy may be proved and instructions given thereon, although conspiracy has not been charged. (*People* v. *Robinson,* 61 Cal.2d 373, 397 [38 Cal.Rptr. 890, 392 P.2d 970]; *People* v. *Pike,* 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372 P.2d 656].) Defendant relied upon *People* v. *Robinson, supra,* as authority for his proposition that there was no proof of conspiracy here, and that instructions given by the court on the subject were inadequate because the court did not, of its own motion, give instruction CALJIC No. 937-A, which is to the effect that evidence that a person was with others engaged in a criminal conspiracy is not sufficient to prove that such person was a member of the conspiracy.

The elements of a conspiracy are shown in the instructions given by the court. Facts within that definition had been a part of the prosecution's proof in this action. ██ Two knives were found; Bazaure and Betancourt were both observed at the scene with knives, and the knives, in evidence, used by each, respectively, were identified. The two cells occupied by defendants were removed from one another only by a single cell. Both answered shower call at the same time. Since both had and did pass the victim on the west side catwalk to reach the showers, certainty exists that the knives were either taken by defendants into the shower, hidden on their persons, or that they had been previously hidden and were retrieved by said defendants simultaneously either in or on the window ledge outside the shower room, or at some intermediate point between the cells and the shower. The attack upon Prock by the two defendants was also simultaneous or nearly so. The evidence summarized above infers a prearranged plan. ██ A conspiracy may be proved by circumstantial evidence. (*People* v. *Osslo,* 50 Cal.2d 75, 94 [323 P.2d 397]; *People* v. *Steccone,* 36 Cal.2d 234, 238 [223 P.2d 17]; *People* v. *Buckman,* 186 Cal.App.2d 38, 46 [8 Cal.Rptr. 765].)

The facts in *Robinson, supra,* are dissimilar. The court there had held that the defendants were accomplices as a matter of law. The trial court had instructed the jury that *if* it found them to be accomplices, corroboration of the testimony of accomplice Hickman must be shown. The implication

was that if the jury found Hickman was not an accomplice, no corroboration was necessary. (*Id.* at p. 394.) There had been improper cross-examination permitted in which Hickman had been required to restate on the witness stand the same evidence as that contained in his extrajudicial statement. The court had instructed the jury that this evidence could be considered against the codefendants. The Supreme Court (per Justice Peters) held this to have been prejudicial error. It also held that the error was compounded because the trial court had instructed on the law of conspiracy, stating *inter alia,* that an absent joint conspirator was jointly responsible for the act of his coconspirator within the scope of conspiracy. During the trial the prosecution had not relied upon a conspiracy. We do not find *People* v. *Robinson, supra,* either binding or persuasive authority.

We are satisfied that when the instructions given in the case at bench are viewed in their entirety the jury could not have been misled. There was no error. (*People* v. *Terrell,* 138 Cal. App.2d 35 [291 P.2d 155].)

██ Defendant's next contention is that the statement of the victim Prock to Sergeant Scott that he had been stabbed by "the fat boy" or "the fat one"[1] was improperly admitted. There is no question that all three of the possible words used described Bazaure. The testimony was that he was obese and that of the thirty-five inmates then outside the cells of D Unit he was the only one to fit the description. There was also evidence that, although his more frequent nickname was "Moose," he was also sometimes called "fat boy." The evidence when offered was objected to and it is alleged that no sufficient foundation had been laid by the prosecution for its admission into evidence.

This court in *People* v. *Keelin,* 136 Cal.App.2d 860, at pages 868-869 [289 P.2d 520, 56 A.L.R.2d 355], defines "spontaneous exclamation." It also states the theory of its admissibility. ██ It is one "made immediately after some exciting occasion by a participant or spectator and asserting the circumstances of that occasion as it is observed by him. ██ The admissibility of such exclamation is based on our experience that, under certain external circumstances of physical or mental shock, a stress of nervous excitement may be produced

---

[1] An inmate who overheard Prock's declaration thought that he had said "big boy" or something similar to that.

in a spectator which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. ▮ Since this utterance is made under the immediate and uncontrolled combination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him.'' (*People* v. *Keelin, supra,* at pp. 868-869, quoting 6 Wigmore, Evidence (3d ed.) § 1745, p. 132.) ▮ Under this definition the statement by Prock was a ''spontaneous exclamation.'' It was also a ''dying declaration'' under Code of Civil Procedure section 1870, subdivision 4, which in pertinent part provides for the admission into evidence ''in criminal actions, the act or declaration of a dying person, made under a sense of impending death, respecting the cause of his death.''

▮ Whether evidence be offered as a ''spontaneous exclamation'' or as a ''dying declaration,'' a proper foundation must be laid, the sufficiency of which is preliminarily determined by the trial judge with final determination left to the jury under instructions to disregard it if it finds the statement does not meet the conditions of admission. (Witkin, Cal. Evidence (1958) § 258, p. 295; *People* v. *Keelin, supra,* p. 872.) ▮ Such instructions were given here. Notwithstanding defendant's argument to the contrary, a sufficient foundation had been laid before the trial court was asked to, or did, admit the statement into evidence. We have summarized Sergeant Scott's testimony hereinabove. He had arrived in D Unit within seconds after Prock's screams proclaiming the commencement of the attack. He observed Prock running down the stairs and ran to his assistance. Sergeant Scott testified that the period of time from the first scream to the time of Prock's statement was approximately 20 seconds. As stated above, upon making the statement, Prock's mouth had filled with blood. Within five seconds he was unconscious and he died within a very short period of time thereafter.

A miscellany of other contentions have been urged by defendant. We consider some of them briefly:

▮ An officer, Blodgett, was produced as a witness on surrebuttal by defendant. Through him defendant sought to introduce a report made by Blodgett to Captain Stephens.

The report was referred to as an "incident" report. Admission was sought on the theory that this was a "business record" under the Uniform Business Records as Evidence Act. (Code Civ. Proc., §§ 1953e-1953h.) Objection to its admission was made by the prosecution and sustained. The stated purpose of its offer was to impeach certain witnesses of the prosecution. It was not stated to the court who the witnesses were nor what statements the report would have impeached. The relevancy of the report was not pointed out, except as it might have been guessed by the subsequent questioning of Officer Blodgett after the ruling. It appeared elsewhere in the record that the report was not written until 30 days after the stabbing. (See Code Civ. Proc., § 1953f; *Reisman* v. *Los Angeles City School Dist.*, 123 Cal.App.2d 493, 503 [267 P.2d 36].) This assignment of error must be denied.

Defendant offered an instruction on the defense of "alibi." The instruction was incorrect and was properly refused. By its terms the jury would have been instructed that proof of "lack of participation" by Bazaure in the crime would constitute an "alibi." "The correct instruction on alibi is that if the jury have a reasonable doubt as to whether the defendant *was present at the time the crime was committed* he is entitled to an acquittal." (Italics supplied.) (Witkin, Cal. Criminal Procedure (1963) § 484, p. 490.) All of the evidence, including that offered by defendant, showed that he *was* present at the time of the stabbing. The court, under the circumstances here present, was not required to give an instruction on the defense of "alibi." (*Op. cit.*, § 472, p. 479.)

Various instances of alleged misconduct by the prosecuting attorney are cited. He referred to the possibility that this stabbing and the presence of blood might have triggered further acts of violence by "those wild animals," referring to other inmates (but not to the defendants). The prosecuting attorney, during argument, referred to defense witness Abilez as one who "but for good luck should be the third man on trial here." Defendant contends that this was a contention based upon evidence in possession of the district attorney not produced at the trial. (But there had been substantial evidence in the nocturnal conversations between Betancourt, Bazaure and *Abilez* which strongly pointed to the latter as one of the assailants. Even were we to hold that the related incidents exceeded the limits of proper prosecution advocacy

(and we do not so hold), we would still have to find them harmless. The jury's verdict was unaffected thereby. (See, e.g., *People* v. *Burnette,* 39 Cal.App.2d 215, 230 [102 P.2d 799]; *People* v. *Hunter,* 49 Cal.App.2d 243, 250-251 [121 P.2d 529].)

Other assignments of error we deem to have insufficient merit to justify discussion.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied July 2, 1965, and appellant's petition for a hearing by the Supreme Court was denied August 4, 1965.